**UNITED STATES of America, Plaintiff-Appellant,**

v.

**Murray Morris KESSLER, Richmond C. Harper, Adler B. Seal, James M. Miller, Jr., and Joseph Mazzuka, Defendants-Appellees.**

No. 74–4190.

United States Court of Appeals, Fifth Circuit.

May 3, 1976.

Rehearing and Rehearing En Banc Denied June 28, 1976.

Gerald J. Gallinghouse, U. S. Atty., Jimmy L. Tallant, Sp. Atty., New Orleans Strike Force, U. S. Dept. of Justice, J. Phillip Krajewski, New Orleans, La., Mervyn Hamburg, Sidney M. Glazer, App. Sec., Crim. Div., Dept. of Justice, Washington, D. C., for plaintiff-appellant.

Murray Morris Kessler, E. Howard McCaleb, New Orleans, La. (Court-appointed), for Kessler.

Ralph Brewer, Baton Rouge, La. (Court-appointed), for Seal.

William L. Crull, New Orleans, La. (Court-appointed), for Miller.

A. J. McNamara, Metairie, La. (Court-appointed), for Mazzuka.

Donald Scott Thomas, Jr., Austin, Tex., for Harper.

Before GEWIN and AINSWORTH, Circuit Judges, and MARKEY *, Chief Judge.

MARKEY, Chief Judge:

The Government appeals an order of the United States District Court for the Eastern District of Louisiana which dismissed a two-count indictment charging the five defendants [1] with criminal conspiracy [2] and criminal attempt to export a military explosive.[3] The appeal is based on 18 U.S.C. § 3731.[4]

### Background

The five defendants (hereafter "the defendants") were arrested on July 1, 1972. A first indictment was returned December 21, 1972 in the Alexandria Division of the Western District of Louisiana. Arraignment in Alexandria occurred on January 15, 1973. Various discovery and pretrial motions were filed in that court, including a motion to dismiss for lack of a speedy trial.

---

* Of the U. S. Court of Customs and Patent Appeals, sitting by designation.

1. In total the indictment names seven defendants and one coconspirator (Jaime Fernandez, a resident of Mexico) not named as a defendant. One defendant (Francisco "Paco" Flores, a resident of Mexico) was not arrested. The case against one defendant (Marion Hagler) was severed prior to trial on the ground of ill health.

2. Violation of 18 U.S.C. § 371 (conspiracy to violate 22 U.S.C. § 1934(a) and (c) by exporting from United States to Mexico arms, ammunition, and implements of war within designated categories of the United States Munitions List, 22 C.F.R. § 121.01, without obtaining export license from Department of State required by 22 C.F.R. § 123.01).

3. Violation of 22 U.S.C. § 1934(a) (attempt to export from United States to Mexico a quantity of Composition C–4 military explosive, which is within the United States Munitions List, without obtaining an export license).

4. 18 U.S.C. § 3731 provides:

§ 3731. Appeal by United States.

In a criminal case an appeal by the United States shall lie to a court of appeals from a decision, judgment, or order of a district court dismissing an indictment or information as to any one or more counts, except that no appeal shall lie where the double jeopardy clause of the United States Constitution prohibits further prosecution.

\* \* \* \* \* \*

The provisions of this section shall be liberally construed to effectuate its purposes. The legislative history of § 3731 is analyzed in *United States v. Wilson*, 420 U.S. 332, 337–39, 95 S.Ct. 1013, 1019, 1020, 43 L.Ed.2d 232, 238, 239 (1975).

On March 30, 1973 a second indictment, covering the same alleged offenses, was filed in the Shreveport Division of the Western District of Louisiana. The Alexandria indictment was dismissed on the Government's motion. Arraignment under the second indictment was held May 4, 1973 in Shreveport. Various discovery and pretrial motions were filed in that court, again including a motion to dismiss for lack of a speedy trial.

Several of the defendants filed motions for a change of venue to the Eastern District of Louisiana at New Orleans. On July 11, 1973 the case was transferred to New Orleans where various discovery and pretrial motions were filed anew. On November 28, 1973 the District Court denied a third motion to dismiss for lack of a speedy trial. On February 8, 1974 the case was set for a jury trial on June 24, 1974.

Trial commenced on the appointed day. The Government's principal witnesses were Alfonso Cortina Rodriguez (hereafter "Cortina"), an agent of the Mexican Government, and Cesario Diosdado, a United States undercover agent. A summary of their testimony follows.

Cortina testified concerning statements and acts of two residents of Mexico, Jaime Fernandez, the absent unindicted coconspirator, and Francisco "Paco" Flores, the absent nonarrested defendant (see note 1, supra). His testimony concerned statements made to him or in his presence at various times and places during the course of the alleged criminal conspiracy dating from its genesis on February 6, 1972 when, Cortina said, Fernandez first approached him in Mexico City and asked if he knew "who might be interested in buying some weapons that were for sale in the United States." Cortina testified that he met Fernandez the next day and that "[h]e told me that he had the weapons, and that he would call his friend, Paco [Flores], at Piedras Negras [Mexico], to know about the price."

Defendants immediately objected on the grounds that such testimony violated the hearsay rule, that the declarant (Fernandez) was not and had not been available for cross-examination, and that the right of confrontation was being violated. The trial judge overruled these objections and stated "[w]e have to start somewhere in a conspiracy trial." The jury was cautioned that the out-of-court statements of Fernandez were "being admitted subject to the evidence establishing a conspiracy" because "[i]f a conspiracy is shown beyond a reasonable doubt by the evidence, then any statements made by a conspirator, is admissible, if made in furtherance of the conspiracy."

Cortina then testified that he met Fernandez again on April 24, 1972 at a garage in Mexico City at which time Fernandez opened the trunk of a car and took out an AR–180 rifle[5] stating this was "an example" of the weapons.[6] Cortina further stated that during their conversation on April 24, 1972, Fernandez asked him for assistance in obtaining the release of Garcia, a friend of Fernandez, who was in a United States federal penitentiary. Cortina testified: "He [Fernandez] said he had some American friends in the [U. S.] Embassy who wanted me [Cortina] to help him with a friend [Garcia] who was in prison." Cortina then obtained 2,000 pesos from his superior officer and the next day purchased the AR–180 from Fernandez with this money, although Fernandez was willing to let Cortina take the weapon without payment. Over a defense objection, the AR–180 was admitted in evidence (Government Exhibit No. 3).

On May 26, 1972 Cortina introduced United States undercover agent Diosda-

---

**5.** At the oral hearing of this appeal, Government counsel referred to the AR–180 as a "machine gun."

**6.** Another Government witness, Agent Early, testified on cross-examination later in the trial, that this particular AR–180 had been purchased in October, 1971 by Mexican Agent Fregoso at a discount sporting goods store in Eagle Pass, Texas and that Fregoso had given the rifle to his superior officer Espindola. The record does not indicate how the rifle got from Espindola to Fernandez.

do to Fernandez in Mexico City. Diosdado was apparently introduced under the assumed name of "Carlos Diaz," and described as a United States "official" who could assist Fernandez in the Garcia matter.

The next day Diosdado and Cortina met at the residence of Fernandez and Fernandez placed a telephone call to Flores, who lived in Piedras Negras, Mexico. Fernandez and Diosdado (who was introduced as the "client") talked to Flores. Flores was reluctant to say "anything" over the telephone, and he told them to come to Eagle Pass, Texas. Diosdado made a tape recording of this telephone conversation, and Fernandez was aware of this tape recording. Fernandez also told Diosdado that he had made tape recordings of earlier telephone conversations with Flores regarding arms.

On May 29, 1972 Fernandez, Cortina, and Diosdado flew from Mexico City to San Antonio, Texas, where they were met by defendant Hagler (see note 1, supra). The next day the trio met with Flores and a meeting was held at a hotel in Eagle Pass, Texas where defendant Harper, owner of the hotel, was introduced to Cortina, Diosdado and Fernandez. According to Cortina, some of the details [7] of an arms sale were discussed at this meeting, but the weapons were said to be located in New York City. According to Diosdado, he obtained a 3-day Letter of Credit from a San Antonio bank then he and Flores made an airplane trip to New York City on June 2, 1972, where they met defendant Kessler. Kessler drove to a steel company plant located in Newark, New Jersey. He told Diosdado that "unfortunately the arms were not there any longer" and that "the arms had been moved to Virginia." Nevertheless, Kessler assured Diosdado that the transaction would be completed by June 30, 1972. On June 17, 1972, Kessler met Diosdado in Mexico City and further discussed the weapons which

were available. For the first time, Kessler stated that Composition C–4 plastic explosive was available also. Kessler informed Diosdado that the payment for the transaction was to be in the form of $100 bills, rather than by Letter of Credit which defendant Harper had originally insisted upon.

Diosdado testified that on June 28, 1972, he, Cortina, and two other undercover United States agents met Kessler at the airport in Vera Cruz, Mexico. Kessler introduced them to defendant Seal, a pilot. They drove to the town of Minatitian, Mexico, where there was a small airport which was to be used for the landing of the airplane bringing the arms from the United States. The landing strip was inspected by defendant Seal who took photographs of the surrounding area.

Diosdado then testified that he and the two other undercover agents met Kessler late in the evening on June 30, 1972, at a motel near New Orleans, Louisiana. Kessler introduced "Carlos Diaz" (Diosdado) to defendant Mazzuka. Seal then arrived and stated that he would use his private airplane to fly to Shreveport, where the C–4 explosive was warehoused. Kessler stated to Diosdado that a payment of $100,000 was needed to obtain the release of the explosive. Diosdado, however, refused to make any payment because he "had not as much as seen even a rifle yet, let alone all the other arms they had been talking about."

Then, according to Diosdado, they went out to the motel parking lot where Mazzuka had parked a rental van truck. Mazzuka opened the back end of the van and Seal took out some electric blasting caps or detonators and some rolls of "prima cord." Diosdado indicated satisfaction with what he saw in the van. Seal gave Mazzuka some expense money to drive the van to the Shreveport airport, and then Mazzuka drove away.

---

7. Cortina testified that Harper's initial inquiry to Diosdado was whether he had Letters of Credit for the transaction. Cortina also testified that Harper mentioned M–1 rifles, M–16 rifles, Thompson submachine guns, and AR–15 rifles, but that neither Harper nor Hagler ever mentioned AR–180 rifles.

Diosdado testified that he then returned to his motel room where he telephoned other law enforcement officers to inform them of the plans to deliver the C–4 explosive to a waiting airplane in Shreveport. The next day, July 1, 1972, the defendants were arrested.

The foregoing testimony of Agents Cortina and Diosdado, along with that of several minor prosecution witnesses, consumed four trial days.[8] At the beginning of the fifth trial day (June 28, 1974) before the jury came in, defendant Seal moved for a mistrial asserting, *inter alia*, violation of the Sixth Amendment right of confrontation and cross-examination caused by the absence of Fernandez, violation of the hearsay rule because Fernandez was not a coconspirator but was actually "working for the government," and violation of "the right to a fair and impartial jury trial."

In opposition, Government trial counsel argued that Fernandez was a coconspirator until shortly after Cortina received the AR–180 from him, that he had personally met with Fernandez in Mexico City and that Fernandez had refused to come to the United States to appear as a witness, and that there was no way to force a Mexican citizen to testify here. The trial judge then asked: "Didn't they say he [Fernandez] had some official connection?" Government counsel replied: "Fernandez, according to my information, was an addict—not an agent, but an addict." After this disclosure, defendants Mazzuka and Miller joined in the motion for a mistrial. Defendant Harper initially did not join in the motion, his counsel stating: "I'm willing to take my chances with this jury, although there has been quite a bit of hearsay testimony, but I think the Court should issue proper instructions." However, after another defendant's counsel asked the trial judge "if there is a mistrial granted as to some defendants and not others, the trial would go forward for those who have not joined the motion," defendants Harper and Kessler joined the motion. Kessler further moved for dismissal of the indictment.

The trial judge began his ruling on the motions by stating "[o]n the record as it stands, it seems to me that the jury would be more justified in finding that this was a scheme to defraud the people [referring to Diosdado et al.] that put up the money." The District Court then ruled:

I think the mistrial motion should be granted, because, as I said, we have all this testimony, much of which was admitted on the basis of its being subsequently connected with the conspiracy, including statements by Fernandez, acts of Fernandez, admitted in evidence—statements which allegedly were made in furtherance of the conspiracy.

Those statements ordinarily would not have been admitted.

I do not think that the harm could be cured by any instructions that I could give. There has been too much testimony of this nature, that could only be admitted on the basis of it being connected with the conspiracy.

I say this too, without any reflection on the last witness [Diosdado], who was a most unusual witness, I thought, and who, I am sure, was telling the truth, or trying to, but we do have these absent people [Fernandez and Flores], who are not available for cross examination.

The Courts have said that cross examination is one of the greatest instruments for ascertaining the truth.

Statements have been made by Fernandez, according to the evidence, who we now find to be a narcotics addict. The jury doesn't know that he is a narcotics addict, and yet the jury has heard quite a bit of testimony regarding his activities in connection with this investigation.

\* \* \* \* \* \*

---

8. Government appellate counsel stated at oral hearing that the prosecution case in chief had "several days worth of proof yet to go" because the conspiracy count alleges 35 overt acts and, in the Government's view, 24 overt acts "had been established by some proof."

Now, as to this other man, Fernandez, and the other absent witness [Flores], the totality of the circumstances, as counsel described it, leads me to believe that the defendants could not get a fair trial under the circumstances.

I will grant a mistrial in the case as to all defendants. I deny the motion to dismiss the indictment.

The mistrial was declared on June 28, 1974. A new trial was set to begin on December 9, 1974. On November 1, 1974, defendant Kessler filed a motion to dismiss asserting, *inter alia*, personal suffering, death of a major defense witness, mental erosion of other defense witnesses, denial of a speedy trial, and denial of due process. Defendant Harper also filed a motion to dismiss asserting that defendants had been denied a speedy trial as guaranteed by the Sixth Amendment and by Federal Rule of Criminal Procedure 48(b), and that the Double Jeopardy Clause of the Fifth Amendment barred retrial. A hearing was conducted by the District Court on November 23, 1974. At that hearing, defendant Kessler testified to the hardship that he had incurred as a result of the indictment and trial. He testified further that a major defense witness had died. Defendant Harper also testified to the financial and business hardships which he had experienced over the 2½ years since his arrest. Counsel for defendant Harper argued:

> The Court knows that any prosecutor should have known that the testimony, the hearsay testimony, of Jaime Fernandez, was used to seriously prejudice these defendants, particularly with the accompanying strategy of bringing this automatic weapon [the AR–180 rifle] into the courtroom and brandishing it before the jury.

After hearing the Government's argument in opposition to the motions, the trial judge ruled:

> Well, the Government had its day in court.
>
> I believe that the defendants have been prejudiced, and will be further prejudiced, if the trial is postponed, or if it is tried at the time set.
>
> I grant all the motions to dismiss the indictment in this case.

### The Government's Contentions

Appellant's first general contention is that the mistrial ruling was an "abuse of discretion" which "was not made with due deliberation" because there was "neither prosecutorial overreaching nor any other valid basis for granting the defense request for a mistrial." The Government argues that "the crux of the rationale" underlying the mistrial was the absence of Fernandez (whose role is now characterized as "minor" because "[h]e did not participate in any dealings with any of the appellees") but that "there was no real doubt regarding the status of Fernandez as a co-conspirator when [the] statements attributed to him were introduced into evidence." It is argued that the testimony of Cortina amply supports the prosecutor's representation at trial that Fernandez was a coconspirator. If Fernandez became its agent, says the Government, that happened after the events set forth in the testimony. The Government states that the failure to compel the presence of Fernandez was understandable. As an unindicted resident of Mexico, he was beyond the subpoena power of the United States Courts and not subject to extradition under the United States-Mexico treaty appearing at 31 Stat. 1818. In the Government's view, "the aborting of the trial was erroneous because there was no manifest necessity for such drastic action." The Government now suggests several alternatives to the mistrial. The first is that the Government should have been allowed to complete its case in chief. It is said that the testimony of other (unnamed) Government witnesses "may well have illuminated the scope of the conspiracy and the relationship of the coconspirators to Fernandez." A second alternative suggested is that Cortina and Diosdado could have been recalled to clarify the role of Fernandez. A third alternative suggested is that a continuance could have been granted to allow the Government either to make another attempt to secure the presence of Fer-

nandez or to make him available to appellees. And a fourth alternative suggested is that the District Court could have given "the missing witness instruction along with other instructions that would have placed the jury's consideration of Fernandez in proper perspective."

Appellant's second general contention is that the dismissal of the indictment was erroneous because the defendants were not placed in double jeopardy nor denied a speedy trial nor denied due process. Citing *United States v. Romano*, 482 F.2d 1183 (5th Cir. 1973), *cert. denied, sub nom., Yassen v. United States*, 414 U.S. 1129, 94 S.Ct. 866, 38 L.Ed.2d 753 (1974), the Government states that a mistrial granted on a defendant's motion does not bar further prosecution and that no exception applies here because there was no prosecutorial overreaching. Regarding speedy trial, the Government points out that every pretrial motion on speedy trial was denied by the District Court and that the trial judge did not elaborate on the foundation for his dismissal of the indictment, but merely cited the general ground that the defendants had been "prejudiced." Using the speedy trial analytical factors set forth in *Barker v. Wingo*, 407 U.S. 514, 530, 92 S.Ct. 2182, 2192, 33 L.Ed.2d 101, 116 (1972), the Government argues that no basis existed for dismissing the indictment for lack of speedy trial. Finally, the Government argues that the dismissal was not necessitated by the totality of the circumstances, and therefore, due process did not dictate that "extraordinary disposition."

### Defendants' Contentions

Appellee Harper contends that the trial court correctly dismissed the indictment because he was deprived of a speedy trial and because a new trial would subject him to double jeopardy.[9] With respect to speedy trial, Harper ar-

gues that the *Barker v. Wingo* criteria have been fully satisfied. With respect to double jeopardy, Harper argues that the general rule that a mistrial granted in response to a defendant's motion constitutes waiver of "any barriers to reprosecution" should not be applied in the instant case because the mistrial below was the product of "prosecutorial overreaching," citing *United States v. Beasley*, 479 F.2d 1124 (5th Cir.), *cert. denied*, 414 U.S. 924, 94 S.Ct. 252, 38 L.Ed.2d 158, *reh. denied*, 414 U.S. 1052, 94 S.Ct. 557, 38 L.Ed.2d 340 (1973); otherwise "a prosecutor would have the option of first trying his case with inadmissible, prejudicial, and irrelevant evidence—that is, committing known error—in hopes of 'getting away' with it, with the ability to retry the case properly if the first trial is aborted by a mistrial." Appellee Kessler argues that the admission of the hearsay testimony was not harmless error because Fernandez was a "crucial member" of the alleged conspiracy, that the trial judge did not manifestly abuse his discretion in granting the mistrial, and that the trial judge properly dismissed the indictment on lack of a speedy trial. The other appellees argue along lines similar to those of Harper and Kessler.

### OPINION

The dispositive question in this case is whether the Double Jeopardy Clause of the Fifth Amendment[10] would be violated by a retrial of appellees after the trial ended in a mistrial granted at their request, over the opposition of the Government.

The Supreme Court eloquently explained the interests protected by the Double Jeopardy Clause in *Green v. United States*, 355 U.S. 184, 187–88, 78 S.Ct. 221, 223, 2 L.Ed.2d 199, 204 (1957):

> The underlying idea, one that is deeply ingrained in at least the Anglo-Ameri-

9. As a "factual defense," Harper argues that he is innocent of any crime because he insisted that the proposed arms sale use Letters of Credit with the stipulation that, as a condition of payment, the letters would have to be presented with commercial invoices, shipping

manifest, and "all legally required permits attached."

10. United States Constitution, Amendment V, provides in part: "nor shall any person be subject for the same offence to be twice put in jeopardy of life or limb."

can system of jurisprudence, is that the State with all its resources and power should not be allowed to make repeated attempts to convict an individual for an alleged offense, thereby subjecting him to embarrassment, expense and ordeal and compelling him to live in a continuing state of anxiety and insecurity, as well as enhancing the possibility that even though innocent he may be found guilty.

The Court has recently reaffirmed the vitality of this "underlying idea" expressed in *Green v. United States* in *United States v. Dinitz*, —— U.S. ——, ——, 96 S.Ct. 1075, 1079, 47 L.Ed.2d 267, 273, 44 U.S.L.W. 4309, 4311 (1976); *United States v. Jenkins*, 420 U.S. 358, 370, 95 S.Ct. 1006, 1013, 43 L.Ed.2d 250, 259 (1975), and *United States v. Wilson*, 420 U.S. 332, 343, 95 S.Ct. 1013, 1021, 43 L.Ed.2d 232, 241 (1975). Furthermore, where, as here, a mistrial has been declared a defendant's "valued right to have his trial completed by a particular tribunal" is also involved. *United States v. Dinitz*, supra; *United States v. Jorn*, 400 U.S. 470, 484–85, 91 S.Ct. 547, 556–57, 27 L.Ed.2d 543, 556–57 (1971) (plurality opinion); *Downum v. United States*, 372 U.S. 734, 736, 83 S.Ct. 1033, 1034, 10 L.Ed.2d 100, 102 (1963); *Wade v. Hunter*, 336 U.S. 684, 689, 69 S.Ct. 834, 837, 93 L.Ed. 974, 978 (1949).

The mistrial below was granted in response to defendant's motion. In *United States v. Dinitz*, supra, —— U.S. at ——, 96 S.Ct. at 1079, 47 L.Ed.2d at 273, 44 U.S.L.W. at 4311, the Supreme Court referred to the fact that since Justice Story's 1824 opinion in *United States v. Perez*, 22 U.S. (9 Wheat.) 579, 580, 6 L.Ed. 165, the Court has held repeatedly that the question whether under the Double Jeopardy Clause there can be a new trial after a mistrial has been declared without the defendant's request or consent depends on whether there was a "manifest necessity" for the mistrial.

The *Dinitz* opinion then stated that "[d]ifferent considerations obtain, however, when the mistrial has been declared at the defendant's request," and quoted the following reasons for this distinction discussed in the plurality opinion in *United States v. Jorn*, 400 U.S. 470, 485, 91 S.Ct. 547, 557, 27 L.Ed.2d 543, 556 (1971) (including original n. 12 omitted in *Dinitz*):

If that right to go to a particular tribunal is valued, it is because, independent of the threat of bad-faith conduct by judge or prosecutor, the defendant has a significant interest in the decision whether or not to take the case from the jury when circumstances occur which might be thought to warrant a declaration of mistrial. Thus, where circumstances develop not attributable to prosecutorial or judicial overreaching, a motion by the defendant for mistrial is ordinarily assumed to remove any barrier to reprosecution, even if the defendant's motion is necessitated by prosecutorial or judicial error.[12] In the absence of such a

> 12 Conversely, where a defendant's mistrial motion is necessitated by judicial or prosecutorial impropriety designed to avoid an acquittal, reprosecution might well be barred. Cf. *United States v. Tateo* [377 U.S. 463, 468 n. 3, 84 S.Ct. 1587, at 1590, 12 L.Ed.2d 448 (1964)].

motion, the *Perez* doctrine of manifest necessity stands as a command to trial judges not to foreclose the defendant's option until a scrupulous exercise of judicial discretion leads to the conclusion that the ends of public justice would not be served by a continuation of the proceedings. See *United States v. Perez*, 9 Wheat., at 580.

The Supreme Court in *Dinitz* further stated (—— U.S. at —— – ——, 96 S.Ct. at 1080, 47 L.Ed.2d at 274–276, 44 U.S.L.W. at 4312–13):

The distinction between mistrials declared by the court *sua sponte* and mistrials granted at the defendant's request or with his consent is wholly consistent with the protections of the Double Jeopardy Clause. Even when * * * prosecutorial error prejudices a defendant's prospects of securing an acquittal, he may nonetheless desire "to go to the first jury and, perhaps, end the dispute then and there with

an acquittal." *United States v. Jorn, supra* [400 U.S. 470], at 484, [91 S.Ct. at 557, 27 L.Ed.2d at 556]. Our prior decisions recognize the defendant's right to pursue this course in the absence of circumstances of manifest necessity requiring a *sua sponte* judicial declaration of mistrial. But it is evident that when * * * prosecutorial error seriously prejudices a defendant, he may have little interest in completing the trial and obtaining a verdict from the first jury. The defendant may reasonably conclude that a continuation of the tainted proceeding would result in a conviction followed by a lengthy appeal and, if a reversal is secured, by a second prosecution. In such circumstances, a defendant's mistrial request has objectives not unlike the interests served by the Double Jeopardy Clause—the avoidance of the anxiety, expense, and delay occasioned by multiple prosecutions.

\* \* \* \* \* \*

[T]raditional waiver concepts have little relevance where the defendant must determine whether or not to request or consent to a mistrial in response to * * * prosecutorial error. * * * In such circumstances, the defendant generally does face a "Hobson's choice" between giving up his first jury and continuing a trial tainted by prejudicial * * * prosecutorial error. The important consideration, for purposes of the Double Jeopardy Clause, is that the defendant retains primary control over the course to be followed in the event of such error. [Footnote omitted.]

\* \* \* \* \* \*

The Double Jeopardy Clause does protect a defendant against governmental actions intended to provoke mistrial requests and thereby subject defendants to the substantial burdens imposed by multiple prosecutions. It bars retrials where "bad-faith conduct by the judge or prosecutor" threatens the "[h]arassment of an accused by successive prosecutions or declaration of a mistrial so as to afford the prosecution a more favorable opportunity to convict" the defendant. *United States v. Jorn, supra* [400 U.S.], at 485, [91 S.Ct. at 557, 27 L.Ed.2d at 556]; *Downum v. United States*, [372 U.S. 734], at 736 [83 S.Ct. at 1034, 10 L.Ed.2d at 102]. See *Gori v. United States*, [367 U.S. 364], at 369, [81 S.Ct. 1523, at 1526, 6 L.Ed.2d 901, at 905]; *United States v. Jorn, supra*, at 489, [91 S.Ct. at 559, 27 L.Ed.2d at 558] (dissenting opinion); cf. *Wade v. Hunter*, [336 U.S. 684], at 692, 69 S.Ct. at 838, 93 L.Ed. at 979.

 These definitive statements by the Supreme Court make it clear that under ordinary circumstances, a defendant's request for a mistrial removes any constitutional barrier to retrial. Ordinarily, a retrial would be necessary to protect the "public's interest in fair trials designed to end in just judgments." *Wade v. Hunter, supra*, 336 U.S. at 689, 69 S.Ct. at 837, 93 L.Ed. at 978; *Illinois v. Somerville*, 410 U.S. 458, 470, 93 S.Ct. 1066, 1073, 35 L.Ed.2d 425, 434 (1973).[11] But the Supreme Court recognizes that there may be exceptions to that rule—rare cases involving circumstances which are "attributable to prosecutorial * * overreaching," *Jorn, supra*, 400 U.S. at 485, 91 S.Ct. at 557, 27 L.Ed.2d at 556. Where "prosecutorial overreaching" exists, a defendant's mistrial request does not remove the constitutional double jeopardy barrier to a retrial. In such a case, the mere fact that the defendant requested a mistrial is not controlling.[12]

Where "prosecutorial overreaching" is present, the interests protected by the

---

**11.** It is, of course, "of critical importance" to distinguish between the ordinary case where proceedings in the trial court terminate in a mistrial and the case where proceedings in the trial court terminate in the defendant's favor after a complete trial. See *United States v.*

*Jenkins*, 420 U.S. 358, 365 n.7, 95 S.Ct. 1006, 1010, 43 L.Ed.2d 250, 256 (1975).

**12.** The Assistant Attorney General of the Criminal Division of the Department of Justice stated in 1970:

The rule which we glean from the [Supreme] Court's decisions involving the right

Double Jeopardy Clause outweigh the public interest in conducting a second trial ending in acquittal or conviction. This safeguard against "prosecutorial overreaching" provided defendants by the Fifth Amendment's Double Jeopardy Clause [13] complements the "inestimable safeguard against the * * * overzealous prosecutor" [14] provided by a jury trial.

Thus, a stringent analysis of the prosecutor's conduct, considering the totality of the circumstances prior to the mistrial, to determine if there was "prosecutorial overreaching" is our inquiry. If "prosecutorial overreaching" is found, a second trial is barred by the Double Jeopardy Clause notwithstanding the fact that the defendants requested the mistrial.

■ To find "prosecutorial overreaching," the Government must have, through "gross negligence or intentional misconduct," [15] caused aggravated circumstances to develop which "seriously prejudice[d] a defendant" causing him to "reasonably conclude that a continuation of the tainted proceeding would result in a conviction." *United States v. Dinitz,* supra, —— U.S. at ——, 96 S.Ct. at 1080, 47 L.Ed.2d at 274, 44 U.S.L.W. at 4312.

■ In the present case, the Government chose to introduce, through Agent Cortina, the hearsay declarations of the absent alleged coconspirator Fernandez. Then, on the foundation laid by these hearsay declarations, the Government introduced the AR–180 rifle (Government Exhibit No. 3). The defendants, of course, objected to all of this on the various grounds described above. It is elementary that the admissibility of the hearsay declarations, and therefore the AR–180, hinges on whether the declarations were made during the course of and in furtherance of the conspiracy charged, and thus come within the well-recognized coconspirator exception to the hearsay rule. See *Anderson v. United States,* 417 U.S. 211, 218, 94 S.Ct. 2253, 2259, 41 L.Ed.2d 20, 27 (1974); Fed.R. Evid. 801(d)(2)(E); [16] C. McCormick, *Law of Evidence* 645 (2d ed. E. Cleary 1972).

■ Cortina testified that on April 24, 1972 Fernandez said "he had some American friends in the Embassy who wanted me [Cortina] to help him with a friend [Garcia] who was in prison." It is clear from this testimony that, at least at that time, Fernandez was not acting in furtherance of the alleged conspiracy; rather, he was working on a "frolic" of his own to secure the release of Garcia.

---

of retrial is that retrial of a defendant is not constitutionally prohibited following the termination by mistrial or appellate reversal of a criminal conviction as long as the ruling which resulted in the mistrial or reversal was not an acquittal, was for the defendant's benefit (see *Gori,* supra), and was not necessitated by prosecutive misconduct. Compare *Downum v. United States,* 372 U.S. 734, [83 S.Ct. 1033, 10 L.Ed.2d 100]. It is irrelevant whether or not the defendant made any motion for mistrial or consented to the district court's action.
Letter from Hon. Will Wilson to Hon. John L. McClellan, May 13, 1970, *Senate Comm. on the Judiciary, Amendments to the Criminal Appeals Act,* S.Rep.No. 91–1296, 91st Cong., 2d Sess. 10 (1970).
The Supreme Court has consistently rejected "rigid, mechanical rule[s]" in this area. *Illinois v. Somerville,* 410 U.S. 458, 467, 93 S.Ct. 1066, 1072, 35 L.Ed.2d 425, 432 (1973).

13. The Double Jeopardy Clause of the Fifth Amendment was held to be applicable to the States through the Fourteenth Amendment in

*Benton v. Maryland,* 395 U.S. 784, 89 S.Ct. 2056, 23 L.Ed.2d 707 (1969).

14. *Duncan v. Louisiana,* 391 U.S. 145, 156, 88 S.Ct. 1444, 1451, 20 L.Ed.2d 491, 500 (1968); *Williams v. Florida,* 399 U.S. 78, 100, 90 S.Ct. 1893, 1905, 26 L.Ed.2d 446, 460 (1970); *Apodaca v. Oregon,* 406 U.S. 404, 410, 92 S.Ct. 1628, 1632, 32 L.Ed.2d 184, 191 (1972).

15. *United States v. Beasley,* 479 F.2d 1124, 1126 (5th Cir.), *cert. denied,* 414 U.S. 924, 94 S.Ct. 252, 38 L.Ed.2d 158, *reh. denied,* 414 U.S. 1052, 94 S.Ct. 557, 38 L.Ed.2d 340 (1973).

16. Fed.R.Evid. 801(d)(2)(E) provides a "definition" which states that "a statement by a coconspirator of a party during the course and in furtherance of the conspiracy" is "not hearsay." See generally J. Weinstein & M. Berger, *Weinstein's Evidence* ¶ 801(d)(2)(E)[01] (1975). The trial below was conducted in June, 1974 before the effective date of the new Federal Rules of Evidence (Act of Jan. 2, 1975, Pub. L.No. 93–595, 88 Stat. 1926).

The alleged "partnership in crime"[17] was not then his purpose. Therefore, the hearsay declarations of Fernandez at that time (and thereafter) were clearly inadmissible.[18]

The Government, of course, knew before trial that Fernandez had diverted from any purposes of the alleged conspiracy. Nevertheless, the prosecution decided to present Agent Cortina who would voice these hearsay declarations and set the stage for the remainder of the drama. Cortina's testimony gives the distinct impression that Fernandez was a key figure who initiated the whole chain of succeeding events. It must have given the jury the same impression. The Government chose this trial strategy despite the fact that it knew that Fernandez (for some unexplained reason) refused to come to the U. S. and appear as a witness, thus depriving the defendants of any opportunity to test Fernandez by cross-examination and to have the jury weigh his credibility.[19]

■ Next we come to the AR–180 rifle (Government Exhibit No. 3). The AR–180 was admitted in evidence on the basis of the foundation laid by the inadmissible hearsay declarations of Fernandez that it was "an example" of the arms involved in the alleged conspiracy. Because Fernandez was not acting in furtherance of the alleged conspiracy at the time when he made this statement to Cortina, the AR–180 was inadmissible—

it lacked a proper foundation. Moreover, the Government knew in advance of trial that the AR–180 was not only inadmissible, but that it was false evidence.

First, the Government knew that this particular AR–180 had been legally purchased by Mexican Agent Fregoso at a sporting goods store in Texas and then taken back to Mexico and given to his superior officer. Second, the Government knew that none of the appellees had ever mentioned the subject of AR–180 rifles to Agent Diosdado ("Carlos Diaz"), the prospective "buyer." Third, the Government knew that Diosdado had never seen any kind of gun or rifle during his extended negotiations with the alleged "sellers." Thus, the prosecution knew that the AR–180 had no known nexus with the alleged conspiracy and that it was not "an example" of the arms supposedly involved in the alleged conspiracy.[20] Nevertheless, the Government chose to introduce this AR–180 into evidence on the known false basis that it was "an example" of the arms involved in the alleged conspiracy.

■ We conclude that there was intentional misconduct by the Government regarding the AR–180, a known false exhibit, which caused serious prejudice to the defendants' rights to a fair jury trial.[21] Such intentional misconduct is "prosecutorial overreaching" and is one of the "type[s] of oppressive practices at

---

17. "A conspiracy is a partnership in crime." *Pinkerton v. United States*, 328 U.S. 640, 644, 66 S.Ct. 1180, 1182, 90 L.Ed. 1489, 1495 (1946).

18. *Krulewitch v. United States*, 336 U.S. 440, 443–44, 69 S.Ct. 716, 718, 93 L.Ed. 790, 794 (1949), states:

 This prerequisite to admissibility, that hearsay statements by some conspirators to be admissible against others must be made in furtherance of the conspiracy charged, has been scrupulously observed by federal courts.

 And a later case, *Wong Sun v. United States*, 371 U.S. 471, 490, 83 S.Ct. 407, 419, 9 L.Ed.2d 441, 457 (1963), states:

 We have consistently refused to broaden that very narrow exception to the traditional hearsay rule which admits statements of a codefendant made in furtherance of a conspiracy or joint undertaking.

19. If, as the Government now urges, Fernandez' role was "minor" the prosecution could have chosen a trial plan which did not portray him as such a prominent actor or which did not mention him at all (thereby completely eliminating any inadmissible hearsay declarations).

20. While the Government argues that it might have clarified the relationship of the alleged conspirators to Fernandez had the trial continued, it does not argue that it could have linked the AR–180 to the defendants.

21. The facts present an aggravated case where a known false exhibit was offered and admitted in evidence over vigorous objection by the defendants. Here the prosecution's misconduct was more flagrant than in *Giglio v. United States*, 405 U.S. 150, 92 S.Ct. 763, 31 L.Ed.2d 104 (1972) and *Napue v. Illinois*, 360 U.S. 264, 79 S.Ct. 1173, 3 L.Ed.2d 1217 (1959), where the "known false evidence" consisted of

which the double-jeopardy prohibition is aimed." *Wade v. Hunter*, 336 U.S. 684, 689, 69 S.Ct. 834, 837, 93 L.Ed. 974, 978 (1949). The defendants reasonably concluded that a continuation of the tainted proceeding would result in a conviction, and thus they were forced to move for a mistrial.[22]

The instant case demonstrates the wisdom of the Double Jeopardy Clause. The defendants have shown the presence of anxiety, embarrassment, expense, and delay. The testimony given by defendants Harper and Kessler establishes the personal hardship and suffering occasioned by the indictment and trial. We doubt that the experience of the other defendants has been less traumatic. The delay factor is evident on the face of this record: the arrests occurred on July 1, 1972; the first indictment was not filed until December 21, 1972; the second indictment, in a different division, was filed on March 30, 1973; the trial did not commence until June 24, 1974; and the dismissal occurred on November 23, 1974. It is evident that this long passage of time enhances the difficulties of the defendants as memories of relevant events grown dim. We agree with the District Court "that the defendants have been prejudiced." We conclude that a new trial in the present case would amount to harassment and would merely afford the prosecution another opportunity to convict. Thus, the public interest in fair trials ending in just judgments would not be advanced but would be subverted by a new trial in this case.

Therefore to protect "the interests served by the Double Jeopardy Clause—the avoidance of the anxiety, expense, and delay occasioned by multiple prosecutions,"[23] we hold that the District Court correctly dismissed the indictment, and that, under the circumstances of this case, the Double Jeopardy Clause prohibits a retrial.[24] Accordingly, we must dismiss the Government's appeal because 18 U.S.C. § 3731 (note 4, supra) declares that "no appeal shall lie where the double jeopardy clause of the United States Constitution prohibits further prosecution." The appeal is *dismissed*.

DISMISSED.

---

evidence going only to the credibility of a witness, and in *United States v. Romano*, 482 F.2d 1183 (5th Cir. 1973), *cert. denied, sub. nom., Yassen v. United States*, 414 U.S. 1129, 94 S.Ct. 866, 38 L.Ed.2d 753 (1974), cited here by the Government, where the defendants' mistrial request was caused by "the prosecutor's *inadvertent* prejudicial opening remarks," 482 F.2d at 1188.

In *Berger v. United States*, 295 U.S. 78, 88, 55 S.Ct. 629, 633, 79 L.Ed. 1314, 1321 (1935), the Court stated:

[The United States Attorney] may prosecute with earnestness and vigor—indeed, he should do so. But, while he may strike hard blows, he is not at liberty to strike foul ones. It is as much his duty to refrain from improper methods calculated to produce a wrongful conviction as it is to use every legitimate means to bring about a just one.

**22.** We agree with the District Court that the "harm" was so pervasive that it could not be cured by any jury instructions. Thus, the District Court correctly declared the mistrial.

**23.** *United States v. Dinitz*, —— U.S. ——, ——, 96 S.Ct. 1075, 1080, 47 L.Ed.2d 267, 274, 44 U.S.L.W. 4309, 4312 (1976).

**24.** We express no opinion on the speedy trial and due process issues. We note, however, that the present case is not effected by the provisions of the Speedy Trial Act of 1974 (Act of Jan. 3, 1975, Pub.L.No.93–619, 88 Stat. 2076, 18 U.S.C. §§ 3161–74).