UNITED STATES of America ex rel. Rudolph DRAYTON, Petitioner,

v.

Hon. John F. HAYES, a Justice of the Supreme Court of the State of New York, County of Kings, the Supreme Court of the State of New York, County of Kings, and Hon. Eugene Gold, District Attorney, County of Kings, Respondents.

UNITED STATES of America ex rel. Thomas McQUEEN, Petitioner,

v.

Hon. John F. HAYES, a Justice of the Supreme Court of the State of New York, County of Kings, the Supreme Court of the State of New York, County of Kings and Hon. Eugene Gold, District Attorney, County of Kings, Respondents.

Nos. 78 C 711, 78 C 776.

United States District Court, E. D. New York.

May 31, 1978.

Martin Erdmann, The Legal Aid Society, by Paula Sweeney, New York City, for Drayton.

Morris Rubin, Brooklyn, N. Y., for McQueen.

Louis J. Lefkowitz, Atty. Gen. of the State of N. Y. by Barry R. Fertel, Deputy Asst. Atty. Gen., New York City, of counsel, Eugene Gold, Dist. Atty., Kings County, Joel M. Goldberg, Asst. Dist. Atty., Brooklyn, N. Y., for respondents.

## MEMORANDUM AND ORDER

PLATT, District Judge.

By separate orders to show cause with petitions, affidavits and other papers annexed thereto, petitioners have applied for writs of habeas corpus directing respondents to discharge them from custody forthwith and to dismiss Kings County Indictment No. 821–77 against them on the

grounds that any further proceedings against them upon such indictment would subject them to be twice put in jeopardy of life or limb for the same offense in violation of the Fifth and Fourteenth Amendments to the United States Constitution.

The applications arise out of alleged "deliberate misconduct" of Mr. Justice Gerald Held in the trial of the petitioners in December, 1977, in the Kings County Supreme Court and additional alleged "deliberate misconduct" on the part of the prosecutor, Assistant District Attorney Kenneth Ramseur, at such trial.

The facts which do not appear to be in dispute since the respondents specifically referred this Court to petitioner Drayton's statement thereof are, as stated in the latter's memorandum of law, as follows: [1]

### Statement of Facts

"Petitioner Rudolph Drayton and a co-defendant, Thomas McQueen, were alleged to have robbed the owner of a laundromat outside his business establishment on August 19, 1976. Petitioner's arrest resulted from an on-the-street identification by the complainant on March 13, 1977, seven months after the incident. The joint trial on the seven count indictment began on December 9, 1977, with Hon. Gerald S. Held, Justice of the Supreme Court, presiding. The prosecution case rested solely upon the testimony of the complaining witness.

"Mr. Drayton presented an alibi defense. His medical record and the testimony of two witnesses were offered in support of his claim that he was committed to the custody of Creedmoor Psychiatric Center and was being held and treated in a secure observation ward on the date of the crime.

"As required by New York Criminal Procedure Law § 250.20 (McKinney Supp.1977), defense counsel had served advance notice of his intention to offer this alibi evidence. In turn, he requested that the prosecution notify him if it intended to call rebuttal witnesses. The prosecutor, Assistant District Attorney Kenneth Ramseur, informed defense counsel Frank Markus and the Court that the only rebuttal witness the people intended to call was Mr. John Johnson of the ABC News network. The reporter had reported on lax security measures at Creedmoor Psychiatric Center in March, 1974, two years before the incident charged. Defense counsel vigorously contested the propriety of calling Mr. Johnson on grounds of relevance and materiality. After a hearing at which Mr. Johnson was represented by counsel, Justice Held declared that Mr. Johnson's proffered testimony was neither relevant nor material to the factual issues in dispute.

"After granting the motion to quash a defense subpoena served upon Mr. Johnson, the following colloquy ensued in which the Court suggested to the prosecutor that he seek other rebuttal witnesses. . . . [T]he Court . . . name[d] a potential contact in the State Department of Mental Hygiene who was a personal friend and offer[ed] to provide the prosecutor with his home phone number:

"HEARING COLLOQUY:

THE COURT: Well, why didn't you then bring in the New York State Department of Mental Hygiene who medically conducted an investigation and I would assume took steps to correct those defects which were pointed out by Mr. Johnson's investigative series?

MR. RAMSEUR: Your Honor, I didn't have that information available to me. It was an oversight on the part of myself.

THE COURT: Well, you do now and we're not going to resume this case until eleven o'clock tomorrow morning and so, therefore, you'll have the opportunity to speak to the New York State Department of Mental Hygiene and if my memory serves me correctly, Mr. Alfred Besunder is the man to speak with on this and if you want his home telephone number, I think I could get that for you too because he happens to be a friend of mine.

---

**1.** This Court has eliminated certain editorial comments of the petitioner Drayton in the Statement of Facts and has shown such eliminations by appropriate ellipses.

MR. RAMSEUR: Can I use your name, your Honor?

THE COURT: Well, you can tell him I suggested that you call him if that's what you want to do. I have no objection to that.

MR. RAMSEUR: That's the Department of Mental Hygiene.

THE COURT: I forget his official title but he's very high up there and it's part of his jurisdiction. The State, I understand, is broken down into various mental hygiene districts and I believe he's an administrator of that district. Did you ever come across that name?

THE WITNESS [Johnson]: Yes, but I don't think he's the director but I'm not sure what his position is.

THE COURT: He's in a position to steer you in the right direction, I believe.

(Trial transcript at 298–99)

"Defense counsel objected to the presentation of alibi witnesses on the grounds that he had not been afforded notice and asked that if additional witnesses were to be called he be given the adjournment mandated by State statute. The colloquy was as follows:

MR. MARKUS: Your Honor, in the event that the District Attorney has any other counter-alibi witnesses and I remind him and I remind the Court that the District Attorney has already rested, I am first asking—

THE COURT: No, the District Attorney has not rested. He has rested his direct case. The People still have a rebuttal case that's still open. As to whether or not they will produce rebuttal witnesses or they will rest is something that you and I both are going to find out tomorrow at eleven o'clock.

MR. MARKUS: Your Honor, in the event they have any additional witnesses, I am now moving under CPL Section 250.20, paragraph 4 for a three day extension from that date for me to prepare. I am permitted under such section established by the legislature.

THE COURT: I shall establish that when I find out whether the District Attorney

has rebuttal witnesses. I don't want to give an eliminee [sic] decision to your eliminee application. Thank you very much!

MR. PASTOR [Counsel for ABC]: I just want to thank the Court for the courtesy extended to us.

THE COURT: It's always a pleasure to hear a good lawyer submit a good legal argument. All right, gentlemen, is there anything for the Court further on this matter? If not, Mr. Ramseur, you have a long day's work ahead of you and it's already a quarter after four. Eleven o'clock, gentlemen.

(Trial adjourned to Thursday, December 15, 1977)

(Trial transcript at 300–301)

"In light of this colloquy, Mr. Markus . . . spent that evening, December 14, 1977, marshaling his arguments in opposition to the possible submission of the rebuttal testimony suggested by the Court. He also . . . attempt[ed] to secure further witnesses as sur-rebuttal and by morning, he was preparing to present further testimony in support of Mr. Drayton's alibi.

"At approximately 10:00 a. m. on December 15, Mr. Markus asked Mr. Ramseur if the People had secured additional witnesses for rebuttal. He was told that they had not. In reliance upon this representation, he discontinued his efforts to obtain sur-rebuttal testimony. An hour later he was summoned to the courtroom where Justice Held, Mr. Ramseur, the court reporter and others were present. Unknown to Mr. Markus, the court reporter was not recording the discussion. Mr. Ramseur rose to make a special application that he be allowed to call five members of the Creedmoor professional staff as alibi rebuttal witnesses that afternoon at 2:00 p. m.

"Considerable legal argument ensued over this hotly contested issue. Mr. Markus argued in part that the prosecutor had acted in bad faith, since he previously had informed counsel that sur-rebuttal witnesses would be unnecessary. . . . [T]he Court interrupted . . . defense coun-

sel and announced in open court that the entire affair was a 'joke,' and that in fact, no rebuttal witnesses existed.

"Mr. Markus was then directed to give his summation to the jury. That summation was followed by closing remarks of counsel for Thomas McQueen, Mr. Morris Rubin. Following Mr. Rubin's summation, the Court addressed Mr. Rubin at some length concerning summation. Mr. Rubin asked that he be allowed to respond but the judge indicated that he had scheduled other matters and any further proceedings in this case must be postponed until after the luncheon recess.

"Before Mr. Ramseur was to sum up for the People, [after lunch], Mr. Markus . . . moved for a mistrial based upon judicial and prosecutorial misconduct. The motion rested upon three . . . claims: (a) that the admitted 'joke' played upon defense counsel by the prosecutor and the trial judge had so completely unnerved counsel at a critical stage in the trial that he was unable effectively to sum up to the jury or properly to represent his client; (b) that the judge had openly read a newspaper during his summation, thereby conveying to the jury the impression that Mr. Markus' arguments were frivolous; and (c) that the summation was further destroyed by the repeated frivolous objections of the prosecutor.

"    . . . [Defense counsel] stated:

    . . . before I sum up in a case involving the amount of peril to my client, the stakes that are involved in this case, I tried to compose myself, I tried to review in my own mind what I am going to say and how I am going to say it. I do not at that point feel that it is the time for fun and games; I do not at that time feel that I would prefer to be arguing and to call it frivolous is to dignify matters of law. I try to protect my client's interests. I was told that the District Attorney was doing something which a whshed [sic] to oppose and I opposed it in the best way I knew how. So, instead of preparing myself to sum up, instead, I was being toyed with and to be very simple, I was not super-human and I was unnerved . . .

    I ask very seriously if this partakes of a joke or if, instead, this is such a serious abridgement of my client's right to representation by counsel of Constitutional dimensions that, in fact, this Court has created such error that my client must have a mistrial at this time not through any fault of counsel. As the Court knows, I did not place this on the record immediately afterwards, the reason being very simple: I was trying to recompose myself so that I could go forward and sum up to the jury . . .

    Again, as I say, this is depriving my client of a fair trial. I make this motion very reluctantly and I make it reluctantly for one very practical reason: I think I've got a winner. It's as simple as that. I think in spite of everything, my case is still probably so strong that the jury should acquit. I know it was stronger; it would have been stronger without interruptions, without the ribbing referred to, without the Court's reading a newspaper during the summation but facts are facts and my client is innocent and I think that if we were to take a show of hands at this point, I'd win it.

(Motion for Mistrial at 6–7; 13. Attached to Memorandum of Law)

"The judge then granted the motion, recognizing that 'the Court is charged not only with the responsibility of doing right but appearing right also and to avoid the appearance of doing wrong . . . .' (Motion for Mistrial at 15) Upon declaring the mistrial, the judge immediately scheduled the case for retrial on January 26, 1978. Mr. Markus moved for disqualification of Justice Held from presiding further in this matter on the grounds that the Court's display of lack of respect for him and the rights of his client would deprive petitioner of his right to trial by an impartial magistrate. The Court denied this motion asserting that:

. . . As to your application, Mr. Markus for me to disqualify myself, I would probably be happier not hearing the same case twice, however, as Harry Truman once said. 'You can't stand the heat, you get out of the kitchen,' so I'm not going to disqualify myself from hearing this case again.

(Motion for Mistrial at 16)

"Petitioner Drayton pursued his state court remedies by means of an Article 78 proceeding for a writ of prohibition. Hon. J. Irwin Shapiro, Associate Justice of the Appellate Division, granted an order to show cause on January 23, 1978 and stayed all further proceedings pending the Appellate Division determination on the merits. Codefendant McQueen brought a similar proceeding on February 14, 1978 and argument was heard in both actions on February 15, 1978.

"The Appellate Division, in a decision of February 23, 1978, not yet officially reported, denied the relief. The Court did disqualify Justice Held from further participation in the proceedings and incorporated in its decision the stipulation of the District Attorney that no alibi rebuttal witness would be called on retrial. Petitioner sought leave to appeal from the New York Court of Appeals on March 2, 1978. Leave was denied on April 4, 1978. (The denial was reported April 6, 1978 in the *New York Law Journal,* page 10, col. 1.)"

Supplementing the foregoing, the respondents state (and again the same appears to be undisputed) that "the good faith, though ill advised, attempt to play a 'practical joke' on [Drayton's] defense counsel was made in the context of what had been a friendly, cordial and relaxed relationship among defense counsel, the trial judge and the prosecutor."

"This conduct took place off the record, out of the presence of the jury, and, at the time, [Drayton] was not even in the courtroom.

"Upon being told that in fact the prosecution had no rebuttal witnesses to Drayton's alibi, neither counsel protested the matter. [Specifically counsel for Drayton] made no complaint nor did he ask for time to compose himself. Instead the trial proceeded and [both] defense counsel[s] made [their] summation[s] to the jury.

"It was only after defense counsels return to court from the luncheon recess that [counsel for Drayton] claimed to have been so unnerved by the incident that his summation was prejudicially impaired.

"[Drayton's] counsel then asked for a mistrial. This motion was joined in by the [petitioner], Thomas McQueen.

"Before deciding the motion, the trial court told counsel for petitioner[s] that neither motion would be granted unless both defendants requested the mistrial . . ..

"Both motions were granted and the trial terminated."

With respect to the petitioner McQueen's motion for a mistrial, Mr. Justice Held quite clearly conditioned his decision of whether or not to grant petitioner Drayton's application for a mistrial on whether petitioner McQueen joined therein. An examination of the transcript shows equally clearly that both Mr. Justice Held and petitioner McQueen's counsel were fully aware of Section 280.10 of the New York Criminal Procedure Law which provides that on a motion for a mistrial made by only one of two co-defendants "the court must declare a mistrial only as to the defendant . . . making the motion, and the trial of the other defendant . . . must proceed", and Mr. Justice Held also indicated quite clearly that unless petitioner McQueen joined in petitioner Drayton's application, the latter's motion would not be granted. When under such circumstances both petitioners joined in the application, Mr. Justice Held granted the same.

As to the petitioner Drayton, the Appellate Division for the Second Department held that:

"Petition granted to the extent that the retrial should be held before a Justice other than the respondent HELD. Proceeding otherwise dismissed on the merits, without costs or disbursements.

"While what occurred upon the first trial of the indictment must be deplored, the record makes it clear that petitioner was not prejudiced thereby and that the mistrial resulted from the granting of his motion for such relief.

"Upon the argument of this application, the District Attorney stipulated that, upon the retrial, he would call no witnesses other than those called by him on the first trial, unless the petitioner should call additional alibi witnesses."

As to the petitioner McQueen, the Appellate Division held in addition:

"The petitioner in this proceeding was a codefendant of one Rudolph Drayton, whose petition for a writ of prohibition is being determined simultaneously herewith. The reasons set forth in the memorandum decision in that proceeding apply with equal force here. In addition, the petitioner here joined in the mistrial motion of his codefendant, although he was advised by the court that if he did not do so the trial would proceed as to both defendants and that the codefendant's motion for a mistrial would be denied."

Both petitioners' counsel and the Assistant District Attorney[2] agree that federal habeas corpus is available to State defendants such as the petitioners who are facing double jeopardy even though of necessity all State proceedings have not been completed. *See United States v. Lansdown,* 460 F.2d 164 (4th Cir. 1972); *United States ex rel. Russo v. Superior Court of N. J., etc.,* 483 F.2d 7 (3d Cir.), *cert. denied,* 414 U.S. 1023, 94 S.Ct. 447, 38 L.Ed.2d 315 (1973); *Jackson v. Justices of the Superior Court of Mass.,* 423 F.Supp. 50, 52 (D.Mass.1976), *stay dismissed on the merits,* 549 F.2d 215 (1st Cir. 1977), *cert. denied,* 430 U.S. 975, 97 S.Ct. 1667, 52 L.Ed.2d 370 (1977); *see also Abney v. United States,* 431 U.S. 651, 97 S.Ct. 2034, 52 L.Ed.2d 651 (1977).

Assuming, *arguendo,* the validity of this position, the sole question for this Court is whether a retrial of the petitioners is barred by the double jeopardy clause given the facts as outlined above.

While petitioners concede that the general rule is that when defense counsel makes a motion for a mistrial, such counsel normally waives any claim of double jeopardy on retrial, they claim that under *United States v. Jorn,* 400 U.S. 470, 91 S.Ct. 547, 27 L.Ed.2d 543 (1971), an exception to this rule exists in cases where the mistrial request is precipitated by prosecutorial or judicial overreaching or when misconduct is undertaken for the explicit purpose of provoking a mistrial. *See also United States v. Beasley,* 479 F.2d 1124, 1127 (5th Cir.), *cert. denied,* 414 U.S. 924, 94 S.Ct. 252, 38 L.Ed.2d 158 (1973); *United States v. Kessler,* 530 F.2d 1246, 1256 (5th Cir. 1976). In the *Kessler* case, the Court of Appeals for the 5th Circuit defined prosecutorial or judicial overreaching sufficient to bar a reprosecution as follows (530 F.2d at 1256):

". . . the Government must have, through 'gross negligence or intentional misconduct,' [citing *United States v. Beasley, supra,*] caused aggravated circumstances to develop which 'seriously prejudice[d] a defendant' causing him to 'reasonably conclude that a continuation of the tainted proceeding would result in a conviction.' " [Citing *United States v. Dinitz,* 424 U.S. 600, 96 S.Ct. 1075, 47 L.Ed.2d 267 (1976)].

In addition, petitioners have cited to us two recent cases, *United States v. Martin,* 561 F.2d 135, 138–40 (8th Cir. 1977), and *United States v. Weaver,* 565 F.2d 129, 132–33 (8th Cir. 1977), both of which involved mistrials occasioned by prosecutorial conduct occurring before the jury and in which the issue was whether mistrial was motivated and caused by such bad faith, gross negligence or prosecutorial overreaching as to bar reprosecution on double jeopardy grounds.

Quite apart from the fact that the Appellate Division made no such finding and has expressly found that "the record makes it clear that petitioner was not prejudice thereby" (i. e., what occurred upon the first trial of the indictment), and that these fac-

---

2. The State Attorney General's Office which has filed briefs herein does not however, agree.

tual findings "shall be presumed to be correct," 28 U.S.C. § 2254(d), an examination of the record in this case does not disclose any material facts to undermine these conclusions.

To begin with, the alleged harassment of petitioner Drayton's counsel during his summation by the prosecutor is wholly without merit. The prosecutor did make a number of objections and Mr. Justice Held, in this Court's view, quite properly and fairly ruled on each of such objections with appropriate instructions in each instance to the jury; some times ruling in favor of the prosecution and at other times ruling in favor of the petitioner.

In the second place, while Mr. Justice Held conceded in considering petitioners' motion for a mistrial that while he "did look at the Law Journal . . . conceivably and quite possibly . . . during the time that you (counsel for petitioner Drayton) were speaking, [I]t wasn't for the whole period of time certainly, but it was part of the time", a perusal of petitioner Drayton's summation quite clearly shows that Mr. Justice Held was fully cognizant of all that was being said by counsel during the summation and the objections that were being taken from time to time with respect thereto. Moreover, no objection was raised by either of petitioners' counsel during or immediately after the summations with respect to this conduct by Mr. Justice Held. Accordingly, this alleged misconduct would not appear to warrant the type of relief sought by the petitioners in this Court.

Finally, petitioner's claim for habeas corpus relief based on the above-entitled "practical joke" on petitioner Drayton's counsel engaged in by the Court and the prosecutor in an off-the-record proceeding in the absence of both the jury and petitioner Drayton is also without merit. In this Court's opinion, this "practical joke," while certainly unfortunate and out-of-place in a judicial proceeding of this nature, falls far short of the type of "gross negligence or

intentional misconduct" which would justify the granting of petitioners' double jeopardy claims.

In this regard, petitioner Drayton first fails to show substantial prejudice resulting from the joke to justify the relief sought. It stretches ones credulity to the limits to accept petitioner Drayton's counsel's claim that he was so "unnerved" by the "practical joke" that he was unable to give a proper summation to the jury on behalf of his client. On one of the oral arguments respondents advised this Court that petitioner Drayton's counsel has been trying cases for the Criminal Defense Division of the Legal Aid Society for the past five years. This experience alone should have enabled (and in this Court's opinion unquestionably did enable) defense counsel to cope with the "practical joke" played by the judge and prosecutor under the circumstances outlined herein. An examination of defense counsel's summation shows quite clearly that there was little, if anything, lacking in the substance of the summation to the jury by defense counsel, and Drayton's counsel himself, in making his motion for a mistrial, argued only that "it might have been better" had the joke not occurred.[3] Clearly then, the prejudice to defendant stemming from the "practical joke" was not substantial and part of the motivation underlying petitioner Drayton's mistrial motion was a voluntary decision to opt for a new trial. Under such circumstances the People should not be precluded from retrying.

Moreover, petitioners fail to show the malicious harassment or bad faith on the part of the trial court and prosecutor required for success on their double jeopardy claims. It is almost axiomatic that one does not "tease" or play practical jokes of the kind played in this case on one for whom there is any animosity or bad feeling. Quite to the contrary, if anything, such conduct indicates a rather warm relationship between the parties and would have been accepted as such by any normal hu-

---

**3.** Drayton's counsel has submitted no affidavit in conjunction with this petition as to the effect of the "practical joke" on him during summa-

tion; the Court is therefore limited to his comments made before Justice Held in this regard.

man being, and, as indicated above, the uncontradicted facts indicate there existed a "friendly, cordial and relaxed relationship among defense counsel, the trial judge and the prosecutor."

Having failed to show sufficient prejudice or the requisite malicious harassment or bad faith, petitioners are not entitled to the habeas corpus relief sought here under the logic of *United States v. Jorn, supra.*

Petitioner McQueen makes the additional claim in his motion papers that he "was *forced* to join co-defendant Drayton's request for a mistrial by reason of intentional and continued misconduct of the trial justice and prosecutor which deprived Petitioner of his right to a fair trial and to the effective assistance of counsel." (Emphasis added). Otherwise, his counsel says, the Court would have denied petitioner Drayton's motion and "such a development would clearly have made petitioner McQueen's counsel the instrumentality for denying Drayton the mistrial to which he was eminently entitled and which the trial Court indicated he would grant."

Petitioner McQueen's counsel frankly conceded on oral argument that Mr. Justice Held's "practical joke" had had no effect on him, stating that he had in effect a thick enough skin to deal with any such incident and he also seems not to have been perturbed by Mr. Justice Held's reading of the New York Law Journal or by any of the objections during summation of the District Attorney. In essence, the grounds of his claim for double jeopardy are that he was "forced" to join in the motion for a mistrial or petitioner Drayton would not have obtained a mistrial to which he (Drayton) was entitled. This alleged coercion, however, appears to this Court to be wholly without substance. Petitioner McQueen and his counsel must be presumed to have been concerned with their best interests, not the best interests of petitioner Drayton. The alternatives given to them by Mr. Justice Held were either to join in the application for mistrial, in which case the same would be granted, or if they did not so join in such an application, to proceed with the

trial. Under the circumstances, petitioner McQueen and his counsel were not forced to do anything except to act in their own best interests. Having opted for a mistrial under such circumstances, petitioner McQueen may not now be heard to complain.

For the foregoing reasons, petitioners' applications for writs of habeas corpus must be, and the same hereby are, denied in all respects.

SO ORDERED.