**UNITED STATES of America**

v.

**Robert CONN, John Christopher, Anthony Giacomino, John Knight, and Frank Petullo.**

**No. 79 CR 610.**

United States District Court, N. D. Illinois, E. D.

Oct. 20, 1980.

Patrick A. Tuite, William J. Martin, Matthew Walsh, Allan Ackerman, Chicago, Ill., for plaintiffs.

Thomas Sullivan, U. S. Atty., Chicago, Ill., for defendant.

## MEMORANDUM OPINION

FLAUM, District Judge:

This matter comes before the court on the motions of defendants Christopher, Giacomino, Knight and Petullo to dismiss the indictment on the ground that further prosecution is barred by the double jeopardy clause of the fifth amendment [1] to the United States Constitution.[2] For the reasons set forth below, the motions are denied.

Count I of the indictment alleges that defendants Conn, Christopher, Giacomino, Knight and Petullo conspired to defraud the Federal Disaster Assistance Administration, Department of Housing and Urban Development (the "FDAA"), by obtaining and aiding to obtain the payment and allowance

---

1. The double jeopardy clause of the fifth amendment to the United States Constitution states: "nor shall any person be subject for the same offence to be twice put in jeopardy of life or limb ...."

2. Defendant Petullo also moved to dismiss the indictment on the ground that the court under its supervisory powers, citing 28 U.S.C. § 2106, should not allow a retrial because defendant Petullo was deprived of his fifth and sixth amendment rights.

of false, fictitious and fraudulent claims for snow removal work supposedly done for the City of Chicago between January 16, 1979 and January 25, 1979, in violation of 18 U.S.C. § 286.[3] Counts two through eleven of the indictment allege that, in a matter within the jurisdiction of the FDAA, defendants Conn[4] and Petullo submitted and caused to be submitted false, fictitious, and fraudulent claims for snow removal work to the City of Chicago Department of Streets and Sanitation—Bureau of Sanitation, in violation of 18 U.S.C. § 1001.[5] Count twelve of the indictment alleges that, in a matter within the jurisdiction of the FDAA, defendant Christopher, by endorsing City of Chicago check number 015826, dated February 28, 1979 payable to McCann Construction in the amount of $111,912.00 (the "check"), represented that he was entitled to the use and benefit of the proceeds of the check when he was not so entitled, in violation of 18 U.S.C. § 1001. Count thirteen of the indictment alleges that defendants Giacomino and Knight received and disposed of the check knowing that it had been unlawfully converted and taken, in violation of 18 U.S.C. § 2315.[6]

The trial began on May 21, 1980. After the Government's principal witness, defendant Conn, testified, the Government turned over to all defense counsel evidence regarding Michael Hageny which did not corroborate parts of defendant Conn's testimony. Defendants Christopher, Giacomino, Knight and Petullo moved either to dismiss the indictment or for a mistrial. On June 4, 1980, the court granted the motions of defendants Christopher, Giacomino, Knight and Petullo for a mistrial on the ground that the evidence regarding Michael Hageny constituted *Brady*[7] material.[8] After a new trial date was set by the court, defendants Christopher, Giacomino, Knight and Petullo moved to dismiss the indictment on the ground that reprosecution violates the double jeopardy clause of the fifth amendment to the United States Constitution.[9]

The evidence regarding Michael Hageny is significant. In a sworn statement dated December 27, 1979 defendant Conn stated, *inter alia*, that in January 1979 he was working with Don Hageny[10] for the City of Chicago as a contractor removing snow from the city streets; that he was advised by someone named Frank[11] in City Hall how to receive payment for removing snow

**3.** 18 U.S.C. § 286 states:

> Whoever enters into any agreement, combination, or conspiracy to defraud the United States, or any department or agency thereof, by obtaining or aiding to obtain the payment or allowance of any false, fictitious or fraudulent claim, shall be fined not more than $10,000 or imprisoned not more than ten years, or both.

**4.** On January 11, 1980 defendant Conn plead guilty on counts 1 and 2 of the indictment.

**5.** 18 U.S.C. § 1001 states:

> Whoever, in any matter within the jurisdiction of any department or agency of the United States knowingly and willfully falsifies, conceals or covers up by any trick, scheme, or device a material fact, or makes any false, fictitious or fraudulent statements or representations, or makes or uses any false writing or document knowing the same to contain any false, fictitious or fraudulent statement or entry, shall be fined not more than $10,000 or imprisoned not more than five years, or both.

**6.** 18 U.S.C. § 2315 states in pertinent part:

> Whoever receives, conceals, stores, barters, sells, or disposes of any goods, wares, or merchandise, securities, or money of the value of $5,000 or more . . . moving as, or which are a part of, or which constitute interstate or foreign commerce, knowing the same to have been stolen, unlawfully converted, or taken . . .
>
> \* \* \* \* \* \*
>
> Shall be fined not more than $10,000 or imprisoned not more than ten years, or both.

**7.** *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963).

**8.** This ruling was without prejudice to the renewal of defendants' motions for dismissal of the indictment if they deemed it appropriate.

**9.** As noted above, defendant Petullo also moved to dismiss the indictment on the ground that retrial is barred under the court's supervisory powers, citing 28 U.S.C. § 2106.

**10.** Don Hageny is Michael Hageny's uncle.

**11.** In his sworn statement defendant Conn stated that he has identified defendant Petullo as the Frank in City Hall.

without actually doing so; that he followed Frank's instructions using the name McCann Construction and the address of Fred Hageny [12] in West Bend, Wisconsin; that after Frank advised him the check was coming in the mail he waited down the street from Fred Hageny's mailbox, took the check from the mailbox after the mail was delivered, took the rest of the mail into Fred Hageny's home and spent the entire evening at Fred Hageny's home; that the next day he returned to Chicago with the check and met Frank and someone named John; that John told him he could get the check cashed without an endorsement; that he, Frank and John went to the house of someone named Tony [13] and the check was given to Tony; that upon his return to Wisconsin several days later, he learned Chicago police had been in Wisconsin inquiring about McCann Construction and snow removal work done in Chicago; and that a day or two later he received a telephone call from an unidentified person instructing him to "shut up or your family won't be there when you get home." At trial defendant Conn testified about these aspects of his statement and added, *inter alia*, that Michael Hageny had come with him when he returned to Chicago with the check; that Michael Hageny had accompanied him to defendant Giacomino's house; and that Michael Hageny had watched television while defendants Conn, Petullo, Knight and Giacomino discussed cashing the check. Thus, other than three of the defendants, only Michael Hageny could corroborate that part of defendant Conn's testimony regarding his trip to Chicago.

After defendant Conn testified the Government turned over to all defense counsel copies of a transcript of Michael Hageny's testimony on July 25, 1979 before the grand jury conducting an investigation into the submission of fraudulent snow removal bills to the City of Chicago by McCann Construction Company and copies of a Federal Bureau of Investigation (the

"FBI") form number FD–302 dated July 30, 1979 (the "302"). Before the grand jury Michael Hageny testified that defendant Conn did not come to, and did not stay overnight in, Fred Hageny's home in West Bend, Wisconsin after the snow removal work was finished (from the time the snow removal work was finished until the time his parents moved out of their home in West Bend, Wisconsin, Michael Hageny and his family lived with his parents in West Bend, Wisconsin); that the next time he saw defendant Conn after finishing the snow removal work was in the summer; and that when the Chicago police asked him about the check, they mentioned "Trunksville," that is, someone involved with the check could be found in a trunk. In the FBI 302 it is stated that Michael Hageny advised that during the first of March 1979 he noticed a lone male, a police officer from West Bend, Wisconsin, sitting in front of Fred Hageny's home on numerous occasions and that he seriously doubts anyone could have tampered with the mail without his knowledge. Thus, Michael Hageny's statements to the grand jury and to the FBI do not corroborate defendant Conn's testimony regarding obtaining the check from Fred Hageny's mailbox and staying overnight at Fred Hageny's home.

Realizing the impeachment nature of the evidence regarding Michael Hageny, defendants Christopher, Giacomino, Knight and Petullo moved either to dismiss the indictment or for a mistrial. These defendants also asked the court to conduct a hearing and receive testimony from Michael Hageny and the court agreed to do so. In that hearing Michael Hageny testified that he did not remember coming to Chicago with defendant Conn in March 1979; that defendant Conn did not stay overnight in, and he does not remember defendant Conn coming to, Fred Hageny's home in West Bend, Wisconsin; that the Chicago Police officers said to him "If you mess with these guys,

**12.** Fred Hageny is Michael Hageny's father.

**13.** In his sworn statement defendant Conn stated that while he was at Tony's house he picked

up one of defendant Giacomino's business cards from the table.

you will end up in Trunksville or in a trunk"; that he told the FBI about a police officer from West Bend, Wisconsin sitting in a car out in front of Fred Hageny's home two or three times; and that he knew a threat had been made against defendant Conn.

The evidence regarding Michael Hageny did not corroborate defendant Conn's testimony in material part and indicated it might have led to the discovery of other evidence if the defense had known about it. Therefore, the court concluded that the evidence regarding Michael Hageny constituted *Brady* material and granted the motions of defendants Christopher, Giacomino, Knight and Petullo for a mistrial.

The question now is whether the double jeopardy clause prohibits reprosecution.

> The constitutional prohibition against "double jeopardy" was designed to protect an individual from being subjected to the hazards of trial and possible conviction more than once for an alleged offense.... The underlying idea ... is that the State with all its resources and power should not be allowed to make repeated attempts to convict an individual for an alleged offense, thereby subjecting him to embarrassment, expense and ordeal and compelling him to live in a continuing state of anxiety and insecurity, as well as enhancing the possibility that even though innocent he may be found guilty. *Green v. United States*, 355 U.S. 184, 187–88, 78 S.Ct. 221, 223, 2 L.Ed.2d 199 (1957).

These considerations led the Supreme Court to conclude that a defendant is placed in jeopardy in a criminal proceeding once the defendant is put to trial before the trier of the facts, whether the trier be a jury or a judge. *Id.* at 188, 78 S.Ct. at 223; *Wade v. Hunter*, 336 U.S. 684, 688, 69 S.Ct. 834, 836, 93 L.Ed. 974 (1949). However, the double jeopardy clause

> does not mean that every time a defendant is put to trial before a competent

tribunal he is entitled to go free if the trial fails to end in a final judgment. Such a rule would create an insuperable obstacle to the administration of justice in many cases in which there is no semblance of the type of oppressive practices at which the double-jeopardy prohibition is aimed. There may be unforeseeable circumstances that arise during a trial making its completion impossible.... In such event the purpose of law to protect society from those guilty of crimes frequently would be frustrated by denying courts power to put the defendant to trial again.... What has been said is enough to show that a defendant's valued right to have his trial completed by a particular tribunal must in some instances be subordinated to the public's interest in fair trials designed to end in just judgments. *Wade v. Hunter*, 336 U.S. 684, 688–89, 69 S.Ct. 834, 836–37, 93 L.Ed. 974 (1949).[14]

In *United States v. Tateo*, 377 U.S. 463, 466, 84 S.Ct. 1587, 1589, 12 L.Ed.2d 448 (1964), the Supreme court elaborated on society's interest in reprosecuting a defendant whose first trial ended in a mistrial:

> Corresponding to the right of an accused to be given a fair trial is the societal interest in punishing one whose guilt is clear after he has obtained such a trial. It would be a high price indeed for society to pay were every accused granted immunity from punishment because of any defect sufficient to constitute reversible error in the proceedings leading to conviction. From the standpoint of a defendant, it is at least doubtful that appellate courts would be as zealous as they now are in protecting against the effects of improprieties at the trial or pretrial stage if they knew that reversal of a conviction would put the accused irrevocably beyond the reach of further prosecution. In reality, therefore, the practice of retrial serves defendants' rights as well as society's interest.

14. Thus, a defendant's "valued right to have his trial completed by a particular tribunal" is sometimes subordinate to a larger interest in having the trial end in a just judgment. *Arizona v. Washington*, 434 U.S. 497, 503 n.11, 98 S.Ct. 824, 829 n.11, 54 L.Ed.2d 717 (1978).

■ The conclusion that "jeopardy attaches" when the trial commences expresses a judgment that the constitutional policies underpinning the fifth amendment's guarantee are implicated at that point in the proceedings. *United States v. Jorn*, 400 U.S. 470, 480, 91 S.Ct. 547, 554, 27 L.Ed.2d 543 (1971). However, in cases in which a mistrial has been declared prior to verdict, the conclusion that jeopardy has attached begins, rather than ends, the inquiry as to whether the double jeopardy clause bars retrial. *Illinois v. Somerville*, 410 U.S. 458, 467, 93 S.Ct. 1066, 1072, 35 L.Ed.2d 425 (1973).

In the plurality opinion in *United States v. Jorn*, four justices of the Supreme Court considered in what circumstances retrial is to be precluded when the initial proceedings are aborted prior to verdict without the defendant's consent. In so doing the plurality stated:

> where circumstances develop not attributable to prosecutorial or judicial overreaching, a motion by the defendant for mistrial is ordinarily assumed to remove any barrier to reprosecution, even if the defendant's motion is necessitated by prosecutorial or judicial error. 400 U.S. at 485, 91 S.Ct. at 557.

In *United States v. Dinitz*, 424 U.S. 600, 96 S.Ct. 1075, 47 L.Ed.2d 267 (1976), the Supreme Court considered whether the double jeopardy clause was violated by retrial of a defendant after his original trial ended in a mistrial granted at his request. There the Court stated:

> The Double Jeopardy Clause does protect a defendant against governmental actions intended to provoke mistrial requests and thereby to subject defendants to the substantial burdens imposed by multiple prosecutions. It bars retrials where "bad-faith conduct by judge or prosecutor," . . . threatens the "[h]arassment of an accused by successive prosecutions or declaration of a mistrial so as to afford the prosecution a more favorable opportunity to convict" the defendant. *Id.* at 611, 96 S.Ct. at 1081.

The Supreme Court reemphasized this in *Lee v. United States*, 432 U.S. 23, 33–34, 97 S.Ct. 2141, 2147, 53 L.Ed.2d 80 (1977), when it stated that there is no double jeopardy barrier to a defendant's retrial

> unless the judicial or prosecutorial error that prompted [defendant's] motion was "intended to provoke" the motion or was otherwise "motivated by bad faith or undertaken to harass or prejudice" [defendant].[15]

Thus, the question before the court is whether the Government's untimely disclosure of the *Brady* material constituted prosecutorial overreaching.[16]

■ Defendants Christopher, Giacomino, Knight and Petullo contend the court should adopt the approach set forth in *United States v. Kessler*, 530 F.2d 1246, 1256 (5th Cir. 1976):

> To find "prosecutorial overreaching," the Government must have, through "gross negligence or intentional misconduct," caused aggravated circumstances to develop which "seriously prejudice[d] a defendant" causing him to "reasonably conclude that a continuation of the tainted proceeding would result in a conviction." (footnote omitted)

The court cannot agree. Firstly, neither the Supreme Court nor the Seventh Circuit has held that a showing of gross negli-

**15.** In *Divans v. California*, 434 U.S. 1303, 98 S.Ct. 1, 54 L.Ed.2d 14 (1977), Justice Rehnquist, as Circuit Justice, stated:

> Any order granting a mistrial at the behest of a defendant in a criminal case is typically based upon error or misconduct on the part of other counsel or the court. In order to elevate such a typical order into one which could form the basis of a claim of double jeopardy, it must be shown not only that there was error, which is the common predicate to all such orders, but that such error was committed by the prosecution or by the court for the purpose of forcing the defendant to move for a mistrial.

**16.** In *Arizona v. Washington*, 434 U.S. at 511 n.29, 98 S.Ct. at 833 n.29, the Supreme Court expressed "no opinion regarding whether the failure of the prosecutor to hand over *Brady* . . . material to the defense at the first trial was deliberate or inadvertent."

gence [17] constitutes overreaching sufficient to invoke the bar of double jeopardy. *United States v. Medina-Herrera*, 606 F.2d 770, 776 n.6 (7th Cir. 1979), *cert. denied*, 446 U.S. 964, 100 S.Ct. 2939, 64 L.Ed.2d 822 (1980); *United States v. Crouch*, 566 F.2d 1311, 1318 .n.9 (5th Cir. 1978); *United States v. Wilson*, 534 F.2d 76, 80 n.6 (6th Cir. 1976). Secondly, the test is not whether the Government caused aggravated circumstances to develop which seriously prejudiced defendants, *United States v. Kessler*, 530 F.2d at 1256, but whether the error was intended to provoke a motion for mistrial so as to afford the Government a more favorable opportunity to convict defendants or whether the error was motivated by bad faith undertaken to harass or prejudice defendants by successive prosecutions. *Lee v. United States*, 432 U.S. at 33–34, 97 S.Ct. at 2147; *United States v. Dinitz*, 424 U.S. at 611, 96 S.Ct. at 1081.

In order to determine whether the error was intended to provoke a motion for mistrial or was otherwise motivated by bad faith or undertaken to harass or prejudice defendants, it is necessary to go beyond the trial record and to inquire into the circumstances surrounding the declaration of the mistrial. *United States v. Wilson*, 534 F.2d at 82; *United States v. Kessler*, 530 F.2d at 1256. Thus, the court asked the two prosecutors and the FBI agent assigned to the case to submit affidavits regarding the Michael Hageny evidence.[18] In ruling on the motions to dismiss the indictment, the court has considered, *inter alia*, the evidence introduced and the testimony elicited during the trial, the *Brady* evidence, the arguments made by the parties during the hearing on the motions for a mistrial, the testimony of Michael Hageny, the arguments made by the parties in the memoranda in support of and in opposition to the motions to dismiss the indictment, and the affidavits of the prosecutors and the FBI agent.

■ The *Brady* material consists of two categories of evidence: (1) the documents (Michael Hageny's grand jury testimony and the FBI 302); and (2) the identity of Michael Hageny as a witness who might be favorable to the defense. The Government's explanation of its conduct differs with regard to the type of evidence involved.[19]

With respect to the documents, the Government represents that it discovered these materials the night before they were turned over to defense counsel. Given the sequence of events, the court is unable to conclude that the Government did not turn over these documents because it intended to provoke a motion for a mistrial or because the nondisclosure was motivated by bad faith or undertaken to harass or prejudice defendants. The FBI 302 records an interview with Michael Hageny on July 25, 1979 and Michael Hageny appeared before the grand jury on July 25, 1979. The interview and the examination of Michael Hageny occurred before the Government knew that: (1) defendant Conn was going to state in his sworn statement that he took the check from Fred Hageny's mailbox and stayed overnight at Fred Hageny's home; and (2) defendant Conn was going to testify that Michael Hageny accompanied him on the trip to Chicago. Approximately six months later defendant Conn plead guilty and made his sworn statement. Sometime thereafter the Government became aware of the alleged involvement of Michael Hageny in the trip to Chicago. Thus, at the time

---

**17.** Mere negligence on the part of the Government is not enough. *Lee v. United States*, 432 U.S. at 34, 97 S.Ct. at 2147.

**18.** Defendants Christopher, Giacomino, Knight and Petullo asked the court for an evidentiary hearing on the issue of prosecutorial overreaching. Before ruling on their motions, the court, with the agreement of counsel for defendants Christopher, Giacomino, Knight and Petullo, asked for submission of the affidavits. After receipt of the affidavits by defense coun-

sel and the court, the court asked defense counsel to submit anything further on the issue of an evidentiary hearing within seven days. Since defense counsel did not submit anything further, the court does not deem it necessary to conduct an evidentiary hearing.

**19.** It is significant to note that these were contemporaneous explanations and not after the fact rationalizations. *United States v. Crouch*, 566 F.2d at 1319 n.11.

Michael Hageny made any of the statements contained within the documents, they did not, and could not, appear to contradict statements of defendant Conn. Had the Government reviewed these documents earlier than it states it did, its *Brady* character would have been, as it later was, obvious. However, this court cannot conclude that the Government was aware of the *Brady* character of the documents prior to the time that it said it was.

With respect to the disclosure of Michael Hageny as a witness who might be favorable to the defense, the Government contends it did not disclose Michael Hageny's identity because it believed that Michael Hageny was refusing to tell the truth due to fear and therefore that Michael Hageny ultimately would tell the truth. After defendant Conn stated that Michael Hageny had accompanied him on the trip to Chicago, the affidavits indicate, *inter alia*, that the Government contacted Michael Hageny and asked him whether he came to Chicago with defendant Conn; that Michael Hageny initially responded in one of several ways: he did not remember the trip, he may have made the trip but did not remember it, he was not sure if he had made the trip because he could not remember very well, he could have forgotten the trip, and sometimes he did not say anything at all; that Michael Hageny admitted to one of the prosecutors accompanying defendant Conn to Chicago and recalled going to a house with defendant Conn and meeting some people; that Michael Hageny did not want to testify because he was frightened; and that Michael Hageny never denied accompanying defendant Conn to Chicago. It is the Government's contention that it considered Michael Hageny a reluctant Government witness because of his fear and that it believed it could convince Michael Hageny to testify truthfully at trial. The Govern-

ment's error was that it failed to recognize that Michael Hageny could persist in his position that he did not remember and that this persistence would make him a favorable witness for the defense. While the court cannot speak admiringly of the Government's pretrial preparation with respect to Michael Hageny, it is unable to conclude that the Government's nondisclosure of his identity was motivated by bad faith or undertaken to harass or prejudice defendants.

In sum, the court has determined that the Government's errors were neither the product of a scheme intentionally calculated to trigger the declaration of a mistrial so as to afford the prosecution a more favorable opportunity to convict nor motivated by bad faith or undertaken to harass or prejudice defendants by successive prosecutions.

Accordingly, the motions of defendants Christopher, Giacomino, Knight and Petullo to dismiss the indictment are denied.[20]

It is so ordered.

---

**20.** As noted above, defendant Petullo also moved to dismiss the indictment on the ground that the court under its supervisory powers, citing 28 U.S.C. § 2106, should not allow a retrial because defendant Petullo was deprived of his sixth amendment rights to confront witnesses and of effective assistance of counsel and his fifth amendment right to due process of law. The court does not agree. Firstly, 28 U.S.C. § 2106 by its express terms only applies to courts of appellate jurisdiction. Secondly, assuming *arguendo* that defendant Petullo was deprived of these fifth and sixth amendment rights, a motion by a defendant for mistrial not necessitated by prosecutorial or judicial overreaching removes any barrier to reprosecution. *E.g., United States v. Jorn*, 400 U.S. at 485, 91 S.Ct. at 557.