779 So.2d 1157 (2000)
Ex parte Carroll H. SULLIVAN.
(In re State of Alabama v. Carroll H. Sullivan).
1990127.
Supreme Court of Alabama.
May 26, 2000.
Rehearing Denied September 1, 2000.
*1158 Donald M. Briskman of Briskman & Binion, P.C., Mobile, for petitioner.
Bill Pryor, atty. gen., and James B. Prude, asst. atty. gen., for respondent State of Alabama.
Frances Allen Long, Sr., Presiding Judge; and H. Ward McMillan, Sue Bell Cobb, Pamela W. Baschab, and James H. Fry, Judges, pro se, as Judges on the Alabama Court of Criminal Appeals.
MADDOX, Justice.
Carroll H. Sullivan, the defendant in a criminal case, petitions for a writ of mandamus directing the Court of Criminal Appeals to vacate its writ of mandamus directing the Mobile Circuit Court to vacate its order dismissing the indictment against Sullivan on the basis of double jeopardy.

I.
This case has a complicated history, which we will briefly recount in order to accurately characterize the issues and the procedural posture of this case. A related *1159 case, Ex parte Zimlich, [Ms. CR-98-1612, June 10, 1999] ___ So.2d ___ (Ala.Crim. App.1999), set aside by State v. Zimlich, [Ms. 1981536, May 5, 2000] ___ So.2d ___ (Ala.2000), provides the initial factual history of the current proceedings. We will paraphrase the pertinent facts found in Zimlich and then further explain how this case found its way to this Court.
In 1993, a female patient died during surgery. Her family filed a medical-malpractice action, which was tried in the Mobile Circuit Court in 1995. Wayne Zimlich, a nurse anesthetist who had attended the operation, testified at that trial. He later admitted that his testimony was false. Zimlich claimed that he was coerced into giving false testimony by the insurance company, his doctor-employer, and the defense attorney for the insurance company.
Sullivan defended Zimlich in the malpractice litigation in which Zimlich allegedly perjured himself. Following charges that Sullivan had suborned Zimlich's allegedly perjured testimony, a Mobile County grand jury indicted Sullivan for first-degree perjury, pursuant to § 13A-10-101, Ala.Code 1975, in October 1998, based on the testimony of Zimlich at the grand jury proceedings. The State procured Zimlich's cooperation by promising him that in his case it would make a favorable recommendation to the sentencing judge. Sullivan's trial was set for March 1, 1999.
One month before the beginning of the trial, Zimlich began to equivocate as to whether he would testify in Sullivan's trial. His attorney informed the prosecutor that Zimlich would invoke his Fifth Amendment privilege unless the State offered him a better deal. The materials before us give no indication that a deal was ever struck, but three weeks before the start of the trial Zimlich affirmed that he would testify against Sullivan. The prosecutor never again spoke with Zimlich regarding his court appearance, so he proceeded with his case under the apparent assumption that Zimlich would not equivocate again.
Sullivan's trial began on the scheduled day. On that day, a jury was empaneled and sworn, and the attorneys delivered their opening arguments. The court then recessed for the evening. On the following morning, the trial continued. The State called Zimlich as its first witness. After a lengthy discussion with the trial court, Zimlich invoked his Fifth Amendment privilege to remain silent. The trial court granted the State's motion for a mistrial, over Sullivan's objection. Sullivan immediately moved to dismiss the charge on the basis that a retrial would violate principles of double jeopardy. The trial court granted his motion, holding that jeopardy had attached when the jury was empaneled and sworn and that a second trial would be barred by the Constitution.
The State, invoking Rule 15.7, Ala. R.Crim. P., appealed the ruling to the Court of Criminal Appeals. That court held that Rule 15.7 did not permit an appeal of this nature; it advised the State that its only remedy had to be by mandamus. State v. Sullivan, 741 So.2d 1125 (Ala.Crim.App.1999).
Pursuant to that court's recommendation, the State petitioned that court for a writ of mandamus directing the trial court to vacate its order dismissing the charge against Sullivan. The court issued the writ, holding that although jeopardy had attached, Zimlich's inconvenient refusal to testify constituted a "manifest necessity"[1] for a retrial. State v. Sullivan, 748 So.2d 914 (Ala.Crim.App.1999).
Sullivan then filed the instant petition with this Court for a writ of mandamus directing the Court of Criminal Appeals to vacate its writ. See Rule 21(e)(1), Ala. R.App. P.
We condense Sullivan's arguments into two issues: (1) Does the fact that the order the State complains of was a final order bar the State from seeking review of *1160 it by a mandamus petition? and (2) Assuming mandamus relief is not barred by the fact that the order was a final order, was the State entitled to mandamus relief on the basis that a "manifest necessity" supported the trial court's declaration of a mistrial?

II.
Sullivan contends that mandamus relief was not available to the State because the trial court's order of dismissal, he says, was a final order, and, therefore, not "interlocutory in nature"that is the term frequently used to describe orders from which one may secure relief by the writ of mandamus. We have said many times that the writ of mandamus "is a drastic and extraordinary writ." Ex parte Horton, 711 So.2d 979, 983 (Ala.1998). Rule 21(e)(4), Ala. R.App. P., reads, in pertinent part:
"The term `extraordinary writ' within the meaning of this rule encompasses the situation where a party seeks emergency and immediate appellate review of an order that is otherwise interlocutory and not appealable."
Sullivan argues that this rule prevents the State from obtaining mandamus relief in this case because the trial court's order of dismissal was not interlocutory.
We agree with Sullivan's characterization of the trial court's dismissal of the indictment as a final order, see generally United States v. Kessler, 530 F.2d 1246 (5th Cir.1976), but we do not agree with his proposition that Rule 21(e)(4), Ala. R.App. P., applies solely to interlocutory orders. No words in that rule limit the availability of mandamus relief to those situations where an order is interlocutory. Rather, the rule denotes a specific situation where mandamus relief will always lie, which is where a party seeks immediate appellate review of an interlocutory, unappealable order. This rule is not exclusionary.
The Court of Criminal Appeals, as an intermediate appellate court with supervisory powers over courts of inferior jurisdiction, is still bound by the oftenstated principles governing when a writ of mandamus may issue. Those principles require that mandamus relief be afforded to a party only in "exceptional circumstances which amount to judicial usurpation of power." Ex parte Nice, 407 So.2d 874, 878 (Ala.1981) (citing Will v. United States, 389 U.S. 90, 95, 88 S.Ct. 269, 19 L.Ed.2d 305 (1967)).
The present case provides an unusual theater, unique to the area of criminal law, for the consideration of a petition for mandamus relief. Here, the trial court has issued a final order, which the State is forbidden by law to appeal.[2]
In Ex parte Nice, supra, this Court engaged in a lengthy discussion of the possibility of mandamus relief in criminal cases, where, as here, the State's appeal of a particular order is foreclosed by law. We stated:
"Mandamus cannot be used as a substitute for appeal, when no appeal is authorized by law or court rule, but mandamus can be used to prevent a gross disruption in the administration of criminal justice. This principle of law is sound and is due to be followed, but equally sound is the principle that mandamus can be used by the government in aid of its lawful rights in the prosecution of criminal cases. In United States v. Dooling, 406 F.2d 192 (2d Cir.1969), *1161 the Court, in granting mandamus, opined:
"`We will not pause to determine whether, if Judge Dooling entered his proposed order, the government would be able to appeal his determination under 18 U.S.C. § 3731 (1964). Even if it were clear that the government could not appeal the government's argument for mandamus would not be made more compelling, for mandamus may not do service for an appeal which has been barred by the Constitution. Will v. United States, 389 U.S. 90, 97, 88 S.Ct. 269, 19 L.Ed.2d 305 ... (1967). We think it equally true that the fact that the government may have no right of appeal does not act as a conclusive bar to the issuance of mandamus in its favor. Certainly the restrictions placed upon the government's right to appeal do reflect important policy judgments by Congress, at their core protecting the right against double jeopardy, which must not be undermined by casual resort to mandamus. But circumstances can arise which present a compelling need for the issuance of mandamus in order to further important countervailing interests. Here we find this need in our responsibility for preventing gross disruption in the administration of criminal justice, and we act pursuant to our supervisory power over the district courts. Cf. United States v. Bryan, 393 F.2d 90 (2d Cir.1968). The Supreme Court, in affirming the issuance of a writ of mandamus by the Court of Appeals for the Seventh Circuit, expressed in the clearest terms its support for the power we now exercise:
"`"We believe that supervisory control of the District Courts by the Courts of Appeals is necessary to proper judicial administration in the federal system. La Buy v. Howes Leather Co., 352 U.S. 249, 259-260, 77 S.Ct. 309, 1 L.Ed.2d 290 ... (1957)."'"
Ex parte Nice, 407 So.2d at 879-80 (emphasis omitted).
The power of an appellate court of this state to issue a writ of mandamus at the request of the State in a criminal case when the Legislature has not provided the remedy of appeal is not unqualified. We have said:
"Casual resort to mandamus cannot be permitted to undermine an accused's right against double jeopardy, and only the rarest of circumstances merit an intervention in a criminal case by mandamus; nevertheless, circumstances can arise which present a compelling need for the issuance of mandamus to further important countervailing public interests."
Ex parte Nice, 407 So.2d at 880 (citations omitted)(emphasis omitted). Clearly, a writ of mandamus is a supervisory order; thus, an appellate court may issue this writ in any situation, within recognized limits, where this writ is necessary to protect the proper judicial administration of the courts. The Court of Criminal Appeals had the authority to review the order of dismissal by considering the State's petition for the writ of mandamus.

III.
We are now left with the question whether the issuance of that writ by the Court of Criminal Appeals was appropriate. Sullivan argues that the Court of Criminal Appeals should have deferred to the trial court's discretionary ruling in which it concluded that no manifest necessity warranted its declaration of a mistrial. We agree.
As the Court of Criminal Appeals correctly noted in its July 2, 1999, opinion in State v. Sullivan, 741 So.2d at 1126, jeopardy attached in this case when the jury was empaneled and sworn. The Double Jeopardy Clause of the Fifth *1162 Amendment[3] to the United States Constitution protects criminal defendants, such as Sullivan, from multiple prosecutions for the same offense. Oregon v. Kennedy, 456 U.S. 667, 671, 102 S.Ct. 2083, 72 L.Ed.2d 416 (1982). The underlying policy of this constitutional principle "is that the State with all its resources and power should not be allowed to make repeated attempts to convict an individual for an alleged offense, thereby subjecting him to embarrassment, expense and ordeal and compelling him to live in a continuing state of anxiety and insecurity, as well as enhancing the possibility that even though innocent he may be found guilty." Green v. United States, 355 U.S. 184, 187-88, 78 S.Ct. 221, 2 L.Ed.2d 199 (1957). While the Double Jeopardy Clause affords this protection, it "does not offer a guarantee to the defendant that the State will vindicate its societal interest in the enforcement of the criminal laws in one proceeding." Kennedy, 456 U.S. at 672, 102 S.Ct. 2083. "If the law were otherwise, `the purpose of law to protect society from those guilty of crimes frequently would be frustrated by denying courts power to put the defendant to trial again.'" Id. (quoting Wade v. Hunter, 336 U.S. 684, 689, 69 S.Ct. 834, 93 L.Ed. 974 (1949)).
Where, as here, a trial is terminated over the objection of the defendant, the State may proceed with a second trial only after showing that the initial proceeding was aborted because of a "manifest necessity." Kennedy, 456 U.S. at 672, 102 S.Ct. 2083. As the Supreme Court has noted, "[t]he `manifest necessity' standard provides sufficient protection to the defendant's interests in having his case finally decided by the jury first selected while at the same time maintaining `the public's interest in fair trials designed to end in just judgments.'" Id. (quoting Wade, 336 U.S. at 689, 69 S.Ct. 834).
The trial court's ruling as to whether there was a "manifest necessity" for granting a mistrial should always be afforded great deference. Ex parte McCall, 541 So.2d 1075, 1076 (Ala.1989).
We cannot say the trial court abused its discretion in this case in concluding that no manifest necessity warranted its declaration of a mistrial after the jury had been empaneled and sworn.
The United States Supreme Court addressed an analogous situation in United States v. Jorn, 400 U.S. 470, 91 S.Ct. 547, 27 L.Ed.2d 543 (1971). That case involved the prosecution of a man for willfully assisting in the preparation of fraudulent tax returns. The Government's case was partially founded on the testimony of five witnesses whom the defendant had supposedly aided in the preparation of the illegal returns. After the trial began, the defense attorney suggested to the court that these witnesses should be warned of their constitutional rights against self-incrimination. The trial court agreed, and advised the first witness of his rights. Upon inquiry, the court then found that the remaining witnesses were similarly situated, so it declared a mistrial. When the case was set for a second trial, the defendant moved to dismiss the case on the ground of double jeopardy. The trial court granted the motion, and the Government appealed.
The Supreme Court found that there had been no manifest necessity for the trial court's declaration of a mistrial. Jorn, 400 U.S. at 486, 91 S.Ct. 547. The Court recognized that a criminal defendant has a clear right to submit his or her case to a jury for a final adjudication with the hope that the proceedings against him or her finally will be concluded. It explained, "[w]here the judge, acting without the defendant's consent, aborts the proceeding, the defendant has been deprived of his `valued right to have his trial completed by a particular tribunal.'" Id. at 484, 91 *1163 S.Ct. 547. Addressing the question of prosecutorial preparedness, the Court said:
"The trial judge must recognize that lack of preparedness by the Government to continue the trial directly implicates policies underpinning both the double jeopardy provision and the speedy trial guarantee. Cf. Downum v. United States, 372 U.S. 734, 83 S.Ct. 1033, 10 L.Ed.2d 100 (1963). Alternatively, the judge must bear in mind the potential risks of abuse by the defendant of society's unwillingness to unnecessarily subject him to repeated prosecutions. Yet, in the final analysis, the judge must always temper the decision whether or not to abort the trial by considering the importance to the defendant of being able, once and for all, to conclude his confrontation with society through the verdict of a tribunal he might believe to be favorably disposed to his fate."
Id. at 486, 91 S.Ct. 547.
The Supreme Court addressed a second similar situation in Downum v. United States, 372 U.S. 734, 83 S.Ct. 1033, 10 L.Ed.2d 100 (1963), where the Government proceeded to trial without ascertaining whether one of its essential witnesses had appeared in order to testify. The Government moved to dismiss the counts against the defendant that depended on that witness's testimony, for want of prosecution. When the Government endeavored to try those counts a second time, the defendant pleaded the bar of double jeopardy. The trial court overruled his plea, and he was convicted. The Supreme Court reversed his conviction, holding that no manifest necessity had warranted a dismissal of the original charge. Downum, 372 U.S. at 738, 83 S.Ct. 1033. The Court stated:
"`The fact is that, when the district attorney impaneled the jury without first ascertaining whether or not his witnesses were present, he took a chance.... The situation presented is simply one where the district attorney entered upon the trial of the case without sufficient evidence to convict. This does not take the case out of the rule with reference to double jeopardy. There is no difference in principle between a discovery by the district attorney immediately after the jury was impaneled that his evidence was insufficient and a discovery after he had called some or all of his witnesses.'"
Downum, 372 U.S. at 737-38, 83 S.Ct. 1033 (quoting Cornero v. United States, 48 F.2d 69, 71 (9th Cir.1931)).
The record suggests that the prosecutor could not proceed without Zimlich's testimony; that was the only evidence regarding the alleged falsity of Sullivan's statements that had resulted in his perjury charge. Several other witnesses were scheduled to testify, but the prosecution felt that their testimony, by itself, was insufficient to meet its prima facie burden.
At the hearing on Sullivan's motion to dismiss, the prosecutor testified that he had spoken with Zimlich's counsel three times between October 1998 (when Zimlich signed an agreement saying he would testify) and March 1, 1999 (when Sullivan's jury was empaneled and sworn).[4] During the prosecutor's second communication with Zimlich's counsel, Zimlich's counsel told the prosecution that Zimlich was vacillating on his previous commitment to testify. One week later, which was three weeks before the date for which Sullivan's trial was set, Zimlich's counsel told the prosecution that Zimlich had once again decided to testify. This affirmation was the last contact the prosecution had with Zimlich before jeopardy attached in the case against Sullivan. Given the importance of Zimlich's testimony to its case, the prosecution had a duty, for the sake of preparedness, to seek assurances from its *1164 key witness that he would testify in accordance with his agreement so that the State would know it had enough evidence to ensure a conviction. Considering the testimony heard by the trial court, we must respect the trial court's discretionary ruling that its previous declaration of a mistrial was not supported by a manifest necessity.
In its brief the State cites several cases in which other courts have held that a manifest necessity for a mistrial exists where a witness becomes unexpectedly unavailable. Those cases, however, are distinguishable from the present case. We discuss two of these cases in order to clarify our decision today.
In United States v. Gallagher, 743 F.Supp. 745, 748 (D.Or.1990), a Federal district court in Oregon found a manifest necessity for declaring a mistrial, where, after jeopardy had attached, the Government's key witness unexpectedly refused to testify. That case dealt with a situation where the prosecution had received no indication that its witness might decide at the last hour not to testify. Notably, the Court distinguished that case from Downum, stating that the case before it was not one in which the prosecution had gambled on whether it was prepared to present its case. 743 F.Supp. at 749.
In United States v. Shaw, 829 F.2d 714, 719 (9th Cir.1986), another case relied upon by the State, the United States Court of Appeals for the Ninth Circuit held that a manifest necessity justified the trial court's declaration of a mistrial. In that case, the Government's witness exhibited inclinations before trial suggesting that he was not going to testify unless he received immunity. When the trial began, there was still no certainty as to whether the Government's witness would be granted immunity; therefore, before opening arguments, the trial court cautioned the Government against discussing any facts that could be presented only through its recalcitrant witness. The Government heeded the warning, but defense counsel referred to several statements that could be discounted only if the witness were present. Although immunity for the witness was later approved, that witness still refused to testify. Consequently, the trial court granted the Government's motion for a mistrial. The Ninth Circuit affirmed, holding that defense counsel's references to matters that would have been covered by the witness's testimony unjustly and incurably prejudiced the Government's case, and, thus, created a manifest necessity for a mistrial. Shaw, 829 F.2d at 719.
The present case is more analogous to Jorn and Downum than to either of these cases or to the other similar cases argued by the State. In Jorn and Downum, inadequate Government trial preparation led to orders aborting criminal proceedings after jeopardy had attached, and in both cases the Supreme Court found no manifest necessity warranting the removal of the bar of double jeopardy. Here, we are faced with a similar set of circumstances, in which the trial judge, based on his familiarity with all the attendant factsespecially as they related to whether Zimlich would, in fact, testifybelieved that the State had failed to carry its burden of showing a "manifest necessity."
This Court has stated that "an accused's valued right to have his trial completed by a particular tribunal will not be subordinated to the public's interest in fair trials designed to end in just judgments unless there is a manifest necessity [for removing the bar of double jeopardy]." Ex parte Collins, 385 So.2d 1005, 1009 (Ala.1980). With that principle in mind, we are guided by the Supreme Court's mandate that we "resolve any doubt in favor of the liberty of the citizen, rather than exercise what would be an unlimited, uncertain, and arbitrary judicial discretion." Downum, 372 U.S. at 738, 83 S.Ct. 1033 (quotation marks omitted). After giving careful and studied consideration to the facts and the law of this case, we conclude that no manifest necessity warranted the diminution of Sullivan's right to be free from having his *1165 freedom twice threatened in the same criminal prosecution.
We hold that the Court of Criminal Appeals' issuance of a writ of mandamus on behalf of the State was improvident. Thus, we grant Sullivan's petition a writ of mandamus directing the Court of Criminal Appeals to vacate its writ of mandamus.
PETITION GRANTED; WRIT ISSUED.
HOOPER, C.J., and HOUSTON, SEE, LYONS, BROWN, and ENGLAND, JJ., concur.
JOHNSTONE, J., concurs specially.
COOK, J., concurs in the result.
JOHNSTONE, Justice (concurring specially).
I concur, but with the caveat that our discussion of United States v. Gallagher, 743 F.Supp. 745 (D.Or.1990), and United States v. Shaw, 829 F.2d 714 (9th Cir. 1986), should not be interpreted as approving the holding of either of those cases. We have simply distinguished those two cases without deciding on the validity of the holdings.
NOTES
[1] See Arizona v. Washington, 434 U.S. 497, 505, 98 S.Ct. 824, 54 L.Ed.2d 717 (1978).
[2] The State's power to appeal from an adverse ruling in a criminal case is governed by § 12-12-70(c), Ala.Code 1975 (providing that an appeal may be taken from a judgment declaring an ordinance or statute invalid); § 12-22-91, Ala.Code 1975 (providing that an appeal may be taken from a judgment holding an indictment or information unconstitutional); and by Rule 15.7, Ala. R.Crim. P. (providing that appeals may be taken from certain pre-trial orders). In the present case, the parties do not dispute that the order at issue here is not appealable.
[3] In Benton v. Maryland, 395 U.S. 784, 89 S.Ct. 2056, 23 L.Ed.2d 707 (1969), the United States Supreme Court held that the Double Jeopardy Clause applied to the States through the Due Process Clause of the Fourteenth Amendment.
[4] The prosecutor testified that he had had no direct contact with Zimlich during this period.