[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 862 
[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 863 
Travis Head petitions this Court for the writ of mandamus directing Tom F. Young, Jr., the circuit judge who presided over Head's criminal trial, or, in the alternative, Howard F. Bryan IV, the presiding judge of the Fifth Judicial Circuit, to enter an order barring a second trial on the ground of double jeopardy. Because Head has failed to demonstrate a clear legal right to the relief he seeks, we deny the petition.
 I. Factual and Procedural Background
Travis Head was tried in the Randolph Circuit Court for the double murder of his father and stepmother. Head pleaded not guilty by reason of mental disease or defect. Based on this defense and because of his status as an indigent, the trial court granted Head's request for money to retain the services of a licensed psychologist as an expert witness. Head admitted during the trial that he had killed his father and stepmother after they had refused to let him go out with his friends. He claimed that his natural mother had let him have alcohol at an early age, that he had begun to abuse alcohol, and that he was drunk on the night of the killings. He testified that he had originally planned to kill himself but that he instead shot his father and stepmother with a pistol.
Head secured the services of Dr. Robert Summerlin, who testified as an expert witness. On direct examination, Dr. Summerlin testified that Head suffered from post-traumatic stress syndrome occasioned by years of abuse from his parents and his stepparents, including two instances of rape by his father. On cross-examination, Dr. Summerlin admitted that he was unable to diagnose Head's post-traumatic stress syndrome until after Head's court-appointed attorneys provided him with summaries of the testimony of other witnesses and of acquaintances of Head. These 30 witness summaries had been supplied to Dr. Summerlin by the defense; they had not been produced to the State. On cross-examination, the State requested permission to inspect these witness summaries, arguing that Dr. Summerlin had based his diagnosis of post-traumatic stress syndrome on them. Over the objection of Head's attorneys, the trial court ordered the defense to produce the summaries.
The summaries contained not only summaries of witness testimony, but also notations pointing out inconsistencies between and among the various statements and recommending the need for reconciliation among the statements. These notations also revealed certain trial strategy, including speculation regarding the manner in which the State would impeach a defense witness. On cross-examination that continued after the State had examined the summaries, the State asked Dr. Summerlin whether "there was in a witness summary of Steven Duncan[1] a note how Travis [Head] and Steven [Duncan] should get together to work this story out," and the State asked Dr. Summerlin to read the note to the jury. Head's attorney objected, *Page 864 
and the trial judge sent the jury out of the courtroom. Head's attorney argued that the summaries that contained these comments had been inadvertently sent to Dr. Summerlin. The judge expressed his concern, saying, "I can't give you protection on this and then give you the benefit of his diagnosis based on these documents that you gave him to work off of." The court then conducted a hearing to determine whether a "manifest necessity" existed to declare a mistrial.
At the hearing, the trial judge first expressed his concern that providing these summaries, which contained notations by Head's attorneys, to Dr. Summerlin and the subsequent production of the summaries to the State would significantly impact the appellate and postconviction process. The judge asked Head: "Are you waiving any effect that those notes might have as to your future defense during this trial and any future Rule 32[, Ala. R.App. P.,] petitions which would address itself to ineffective assistance to counsel as far as the appeal as to that issue only?" The judge also asked Head whether he was willing to waive the attorney-client privilege as to the information contained in the notes. Head stated that he waived his rights as to "those papers." The court then provided Head with the opportunity to consult an attorney who was not involved in his criminal defense, stating: "The Court wants to be sure that your rights are protected. And as importantly that this trial can go on and provide you with a fair hearing." This independent attorney recommended that Head not let the trial continue in light of the fact that his expert witness, and hence his sole defense, would be severely impeached; however, Head maintained his willingness to waive any error by his attorneys in providing the summaries to Dr. Summerlin.
The State moved for a mistrial, arguing that "this thing has gotten to be such a mess there is no way it can be corrected during the course of this trial. If he has a valid defense of not guilty by reason of insanity, it has been blown out of the water by what has happened in this trial. He's entitled to a valid defense. He cannot get it in this trial on that basis." Further, the State argued that any waiver Head had made would not stand up on appeal and that continuing the trial would be "an exercise in futility." The State's concern was that an appellate court "might determine that [Head's] rights have been so compromised that he can never get a fair trial," implying that the defense wanted to go forward with the trial of the case because the defense did not think that a conviction would stand up on appeal.
Head opposed the motion for a mistrial, offering as a possible alternative a continuance to allow Head to retain a new expert witness. However, the prosecutor claimed that any delay would result in scheduling conflicts for the State. Further, the trial judge expressed his concern that if he granted a continuance jurors would begin to forget information learned during the trial and that during the period of the continuance they would be exposed to information in the media concerning the case. Head argued that the judge could give a jury instruction to cure those problems.
The trial court's chief concern was the effect these notes would have on the jury; even though the judge made it clear that he was not questioning the integrity of the attorneys, he recognized that the notes might create the appearance of collusion between witnesses and the inference of manipulation by defense counsel. Explaining that he believed that the defense's case had been jeopardized, the trial judge concluded: "I find that the circumstances surrounding *Page 865 
this have reached a level of manifest necessity. I'm declaring a mistrial." In doing so, he stated: "I am not making this decision based on having to try it again or based on what somebody in Montgomery may do. . . . I just think it would be very difficult for Mr. Head to get a fair trial under the circumstances. . . ."
After the trial judge declared a mistrial, Head filed a motion to dismiss the charges against him, arguing that jeopardy had attached so that he could not be retried on these charges. The trial court held a hearing on Head's motion to dismiss. The court denied the motion because the mistrial had been declared upon a finding of manifest necessity and a finding that going forward with the trial of the criminal charges would prejudice both the State and the defense. Head then filed a petition for a writ of mandamus in the Court of Criminal Appeals. That court denied the petition by an unpublished order, holding that Head had invited the error by failing to comply with the trial court's discovery order and by furnishing his expert witness with the summaries containing defense counsel's strategic comments. The Court of Criminal Appeals held that because the error had been invited error, Head was estopped from asserting a claim of former jeopardy.
Head has now petitioned this Court for the writ of mandamus. He argues that the trial court erred in denying his motion to dismiss based on double-jeopardy grounds because, he argues, the mistrial was not precipitated by manifest necessity. Further, Head contends that neither the Alabama Rules of Evidence nor the trial court's pretrial discovery order required the defense to produce the underlying facts Dr. Summerlin relied upon in formulating his diagnosis. Finally, he argues that it was not error to provide his expert witness with the synopses containing defense counsel's trial strategy.
 II. Standard of Review
A defendant's double-jeopardy claim is properly reviewed by a petition for the writ of mandamus. Ex parte Benford,935 So.2d 421, 425 (Ala. 2006). This Court has held that an accused's constitutional rights against being twice placed in jeopardy cannot be adequately protected by appellate review and that the writ of mandamus is appropriate in a case in which the petitioner argues that former jeopardy bars a retrial on the charges against him. Ex parte Roberts, 662 So.2d 229,231 (Ala. 1995). In order for this Court to issue the writ of mandamus, Head must show
 "`"(1) a clear legal right in the petitioner to the order sought; (2) an imperative duty upon the respondent to perform, accompanied by a refusal to do so; (3) the lack of another adequate remedy; and (4) properly invoked jurisdiction of the court."'
 "Ex parte Bloodsaw, 648 So.2d 553, 554
(Ala. 1994) (quoting Ex parte Alfab, Inc., 586 So.2d 889, 891 (Ala. 1991))."
Ex parte Benford, 935 So.2d at 425. We note, however, that the "writ of mandamus is a drastic and extraordinary remedy." Ex parte Roberts, 662 So.2d at 231.
 III. Analysis
The ultimate issue in this case is whether the trial court's finding that the State and the defense would be prejudiced if the trial were to continue and that a mistrial was in the best interest of the accused sufficiently supports a finding of manifest necessity allowing the State to retry Head.
"The Double Jeopardy Clause of the Fifth Amendment protects a defendant in a criminal proceeding against multiple punishments or repeated prosecutions for the same offense." UnitedStates v. Dinitz, *Page 866 424 U.S. 600, 606, 96 S.Ct. 1075, 47 L.Ed.2d 267 (1976) (footnote omitted). The Fifth Amendment provides: "No person shall . . . be subject for the same offence to be twice put in jeopardy of life or limb. . . ." U.S. Const. amend. V. Seealso Arizona v. Washington, 434 U.S. 497, 503,98 S.Ct. 824, 54 L.Ed.2d 717 (1978) ("A State may not put a defendant in jeopardy twice for the same offense."). The underlying policy of this constitutional principle is that
 "the State with all its resources and power should not be allowed to make repeated attempts to convict an individual for an alleged offense, thereby subjecting him to embarrassment, expense and ordeal and compelling him to live in a continuing state of anxiety and insecurity, as well as enhancing the possibility that even though innocent he may be found guilty."
Green v. United States, 355 U.S. 184, 187-88,78 S.Ct. 221, 2 L.Ed.2d 199 (1957).
Although the Double Jeopardy Clause affords this protection, it "does not offer a guarantee to the defendant that the State will vindicate its societal interest in the enforcement of the criminal laws in one proceeding." Oregon v. Kennedy,456 U.S. 667, 672, 102 S.Ct. 2083, 72 L.Ed.2d 416 (1982). "If the law were otherwise, `the purpose of law to protect society from those guilty of crimes frequently would be frustrated by denying courts power to put the defendant to trial again.'"Id. (quoting Wade v. Hunter, 336 U.S. 684,689, 69 S.Ct. 834, 93 L.Ed. 974 (1949)).
Where, as here, a mistrial has been declared over the defendant's objection, the defendant's "valued right to have his trial completed by a particular tribunal" is also implicated.Wade, 336 U.S. at 689, 69 S.Ct. 834. When a trial is terminated over the defendant's objection, the State may proceed with a retrial only after showing that the initial proceeding was aborted because of a "manifest necessity."Kennedy, 456 U.S. at 672, 102 S.Ct. 2083; Ex parteSullivan, 779 So.2d 1157, 1162 (Ala. 2000). As the Supreme Court of the United States has noted: "The `manifest necessity' standard provides sufficient protection to the defendant's interests in having his case finally decided by the jury first selected while at the same time maintaining `the public's interest in fair trials designed to end in just judgments.'"Kennedy, 456 U.S. at 672, 102 S.Ct. 2083 (quotingWade, 336 U.S. at 689, 69 S.Ct. 834). However, the Supreme Court has held that a "high degree" of necessity is required before a mistrial is appropriate. Washington,434 U.S. at 506, 98 S.Ct. 824.
"The concept of `manifest necessity' does not lend itself to rigid application, and requires a due regard for the facts and circumstances of each case." Huss v. Graves,252 F.3d 952, 955 (8th Cir.2001) (citing Washington,434 U.S. at 506, 98 S.Ct. 824). In this case-by-case inquiry, a reviewing court may consider whether the trial court acted in the defendant's best interests. See Gori v.United States, 367 U.S. 364, 369, 81 S.Ct. 1523, 6 L.Ed.2d 901
(1961) ("Suffice that we are unwilling, where it clearly appears that a mistrial has been granted in the sole interest of the defendant, to hold that its necessary consequence is to bar all retrial."). Another relevant consideration is whether alternatives to a mistrial were explored. See United Statesv. Jorn, 400 U.S. 470, 487, 91 S.Ct. 547, 27 L.Ed.2d 543
(1971) (noting the trial court's failure to consider a continuance as an alternative to mistrial); Ex parteTribble, 783 So.2d 69, 72 (Ala. 2000) ("[A] mistrial should be granted only as a last resort `where it is apparent that justice cannot be afforded' otherwise."). Further, the reviewing court will consider whether the defendant has been given an *Page 867 
opportunity to explain his position on the declaration of a mistrial. Huss, 252 F.3d at 955 (citingWashington, 434 U.S. at 515-16, 98 S.Ct. 824). A final consideration is whether the declaration of a mistrial denied the defendant the right to "retain primary control of the course to be followed" in the event of an error at trial.Dinitz, 424 U.S. at 609, 96 S.Ct. 1075.
The trial court thus must take "all circumstances into account" in deciding whether a manifest necessity for declaring a mistrial exists. Illinois v. Somerville,410 U.S. 458, 462, 93 S.Ct. 1066, 35 L.Ed.2d 425 (1973) (citingWade, 336 U.S. at 691, 69 S.Ct. 834). The trial court has broad discretion in deciding whether to declare a mistrial.Somerville, 410 U.S. at 462, 93 S.Ct. 1066.
 "Where, for reasons deemed compelling by the trial judge, who is best situated intelligently to make such a decision, the ends of substantial justice cannot be attained without discontinuing the trial, a mistrial may be declared without the defendant's consent and even over his objection, and he may be retried consistently with the Fifth Amendment."
Gori, 367 U.S. at 368, 81 S.Ct. 1523.
In the case before us, jeopardy attached when the jury was empaneled and sworn. Ex parte Sullivan,779 So.2d at 1161. The trial judge, during the hearing on whether to declare a mistrial, originally stated that a manifest necessity existed to dismiss the jury based on the concern that Head would be unable to receive a fair determination of guilt or innocence if the trial proceeded. The trial judge believed that the State's cross-examination of Dr. Summerlin, Head's expert witness, concerning the presence of the trial strategies of Head's attorneys and notes concerning witnesses in the witness summaries on which Dr. Summerlin had based his diagnosis of Head would destroy Head's chances of an acquittal. This expert witness was key to Head's mental-disease-or-defect defense, and the fact that Dr. Summerlin made his diagnosis only after examining these summaries suggested that the summaries had a controlling influence on his opinion.
The court further found that going forward with the trial would prejudice the State because Dr. Summerlin had used witness summaries that included the attorneys' thought processes when he testified. The trial judge stated, somewhat obliquely: "There was prejudice to the State, because that was your whole defense." The State, however, contends that "[its] interests were, in fact, frustrated by the errors of the defense." State's brief at 22. Not only did the State have an interest in ensuring a fair trial, but it also argued that continuing the trial would be futile and that a guilty verdict, if one were entered, would never survive an appeal.
Head argues in his petition to this Court, without citing any authority, that "[t]he granting of a mistrial as an expedient measure to avoid the possibility of a case being remanded on appeal is not manifest necessity." Head's petition at 15. However, the Supreme Court of the United States has made clear that "[i]f an error would make reversal on appeal a certainty, it would not serve `the ends of public justice' to require that the [State] proceed with its proof when, if it succeeded before the jury, it would automatically be stripped of that success by an appellate court." Somerville,410 U.S. at 464, 93 S.Ct. 1066.
The trial court also considered the prejudice to Head if the case were allowed to go forward. The record supports the trial court's conclusion that further cross-examination of Dr. Summerlin would deprive Head of his only defense to the murder charges. Head had already testified that *Page 868 
he shot his father and stepmother, and the trial court found that "[s]hort of the finding of posttraumatic stress, [Head] had no defense." Head had explained on the stand the abuse he had suffered, but without the psychiatrist's testimony he lacked any evidence connecting past traumatic events in his life to a legal defense for murder.
Also, the trial judge was concerned that Head was being overly influenced by his attorneys in this matter, because he was offering to waive his postconviction and appellate remedies for what appeared to the court to be a valid claim of ineffective assistance of counsel. The fact that Head wanted to go forward suggested to the court that Head did not understand his best interests and that his attorneys were not looking after Head's best interests, especially considering that an independent criminal attorney advised Head that the cross-examination of his sole expert witness would be "catastrophic to the defense."
We note that the trial court considered other alternatives to declaring a mistrial. Head's attorneys argued that the court should grant a continuance to allow the defense to retain a new expert witness. However, the jury had already heard that Dr. Summerlin had relied on the written summaries to form his diagnosis of Head, as well as the fact that the summaries contained at least one statement indicating that the testimony of various witnesses had to be reconciled. The appearance of collusion may already have been created. Also, the State argued that a delay of three weeks or a month to allow Head to secure a new expert witness not only would result in jurors' forgetting much of what they had heard as testimony in the case, but also could result in outside information tainting the jurors' perception of the case. The State also argued that any delay would create scheduling difficulties.
The trial judge also heard the defense's perspective on a mistrial. Although the trial judge recognized that Head was willing to waive any claim of prejudice and to continue the trial, he doubted that such a waiver would stand up on appeal. Further, the trial judge had concerns that Head's willingness to waive any errors may have been the result of the influence of his attorneys, who wanted to see the case through to the jury. The independent attorney Head had consulted told Head that his case would be devastated by going forward with Dr. Summerlin as the expert, but Head insisted on going forward.
Finally, we examine the extent to which the defendant has lost primary control of the course to be followed in his trial. We recognize that Head's interests here are weighty. "A defendant has an important interest in `concluding] his confrontation with society through the verdict of a tribunal he might believe to be favorably disposed to his fate.'" Huss,252 F.3d at 955-56 (quoting Jorn, 400 U.S. at 486, 91 S.Ct. 547). We also recognize that the prohibition of a retrial prevents the government from "gain[ing] an advantage from what it learns at the first trial about the strengths of the defense case and the weaknesses of its own." United States v. DiFrancesco,449 U.S. 117, 128, 101 S.Ct. 426, 66 L.Ed.2d 328 (1980).
In this case, the State now has an insight into the defense strategy for the trial of the case. This fact is ameliorated, first, because, on retrial, Head will have the opportunity to retain a new expert witness. The summaries will thus not have the same cross-examination value. Also, the extent that any attorney-client confidences have been revealed is not clear. For instance, in arguing against a mistrial, *Page 869 
Head's attorneys suggested that some of the attorney work product contained in the summaries was already reflected in the record. Further, Head's attorneys may have waived the attorney-client privilege on Head's behalf in turning the summaries over to the expert. In any event, there are options to protect Head from prejudice in any retrial as a result of the State's having obtained notes containing his attorneys' trial strategy and concerns. The trial court, for instance, had already ordered the witness summaries sealed so long as Head did not attempt to rely on Dr. Summerlin as his expert witness in the subsequent trial.
Thus, although we recognize that Head has an interest in continuing his trial before "a tribunal he might believe to be favorably disposed to his fate," Jorn,400 U.S. at 486, 91 S.Ct. 547, that does not mean that his interest "may never be forced to yield, as in this case, to `the public's interest in fair trials designed to end in just judgments.'"Somerville, 410 U.S. at 469-70, 93 S.Ct. 1066 (quotingJorn, 400 U.S. at 480, 91 S.Ct. 547). We do not believe that Head's interest in continuing the original proceeding outweighs the societal interest in fair trials and the court system's interest in judicial economy. SeeUnited States v. Elliot, 463 F.3d 858, 868 (9th Cir.2006) ("In order to preserve Elliot's right to conflict-free representation, to save valuable time and resources of the court and the jurors, and to serve the ends of public justice, the district court was justified in declaring a mistrial.").
Given the discretion vested in a trial court in deciding whether to declare a mistrial, we conclude that there was a manifest necessity justifying a mistrial in this case, such that "the ends of public justice would . . . be defeated" if the trial were to proceed. United States v. Perez,22 U.S. (9 Wheat.) 579, 580, 6 L.Ed. 165 (1824). Because Head has failed to demonstrate the existence of a clear legal right to the writ of mandamus, we deny the petition.[2]
 IV. Conclusion
We conclude that the trial court did not exceed its discretion in finding that a manifest necessity required the declaration of a mistrial. Head has thus failed to demonstrate a clear legal right to an order barring the State from instituting a second proceeding. We, therefore, deny the petition.
PETITION DENIED.
NABERS, C.J., and HARWOOD, STUART, and BOLIN, JJ., concur.
[1] Duncan was one of Head's acquaintances.
[2] Head also argues that the Court of Criminal Appeals erred in finding that he had invited the error that precipitated the mistrial and was thus estopped from asserting hisFifth Amendment rights. Because we hold that the trial court did not exceed its discretion in declaring a mistrial, we need not address this argument.